JOSEPH CHAUVIN, Respondent, v. HENRY G. VALITON, Appellant.

CONSTITUTIONAL LAW—*Section 816, fifth division, Revised Statutes, void — "Due process of law."* — *Held*, in the case at bar, that section 816, fifth division, Montana Revised Statutes of 1879, which authorized the summary seizure and sale of property belonging to another, but in use by a person from whom a license was due, violated the fifth and fourteenth amendments to the Constitution of the United States, in allowing property to be taken without "due process of law."

REPLEVIN — *Damages for detention of property — Measure of same — Held*, in the case at bar, an action in replevin for a piano, that the trial court properly rendered judgment for the rentable value of the property from the time the plaintiff was deprived of its use to the day of the trial of the case.

*Appeal from the Second Judicial District, Silver Bow County.*

STATEMENT.

This case was before the Supreme Court on a former appeal. (See *Chauvin* v. *Valiton*, 7 Mont. 581.) One Osborne, a retail liquor dealer in Butte City, Silver Bow County, was indebted to the county for his license (due under § 801, fifth div. Rev. Stats. of 1879) and had failed to pay the same. The treasurer of the county seized a piano belonging to the plaintiff, which Osborne held under a lease and was using at the time in connection with his business, and sold it to the defendant (pursuant to § 816, fifth div. Rev. Stats. of 1879) to pay the said license, and the costs of seizure. The plaintiff brought an action in replevin for the piano, and on a second trial obtained a judgment, the District Court holding that said section 816 was unconstitutional.

*William H. De Witt*, and *Campbell & Duffy*, for Appellant.

Section 816, fifth division, Revised Statutes, Montana, page 579, is constitutional and valid, as provided by its terms and enforced in the case at bar. The statute does not go to the extent of working a forfeiture or confiscation of property; it creates only a lien, and that for only the amount of the license debt. The lien being satisfied, the property is freed from the encumbrance. The law is not, therefore, open to the objection urged to confiscations, made by the learned author in Waples' Proceedings In Rem, sections 232–248. But statutes which go to the extent of a forfeiture have been upheld. In

the United States revenue laws we find legislation similar to our own license lien law, and even more stringent in its provisions. "And all distilled spirits and wines, and personal property *found in the rectifying establishment*, or in any building, yard, or enclosure connected therewith, *and used with or constituting a part of the premises*, shall be forfeited to the United States." (U. S. Rev. Stats. ? 3242.) Section 3281, United States Revised Statutes, goes still further, and carries the forfeiture to the real estate on which the illicit distillery is situated, whoever may own the same. But, as noted above, our statute does not go to the extent of a forfeiture, only to that of a lien for a specified amount. Such lien upon property "held and used" in the licensed business is good. (*Sears* v. *Cottrell*, 5 Mich. 251; *Sheldon* v. *Van Buskirk*, 2 N. Y. 473–478; *Dungan's Appeal*, 62 Pa. St. 204; 8 Am. Rep. 169; Cooley's Constitutional Limitations, 479, 480.) In *Bennett* v. *Hunter*, 9 Wall. 326, the court, speaking of such a sale, says: "The sale was the public act, which is the equivalent of office found. What preceded the sale was merely preliminary, and, independently of the sale, worked no divestiture of the title. The title, indeed, was forfeited by the non-payment of the tax; in other words, it became subject to be vested in the United States, and upon *public sale*, became actually vested in the United States, or *in any other purchaser*." In the case at bar, the "any other purchaser" was the defendant. Such seizure and sale, without action in, or judgment by, a court, is due process of law. (Cases last cited; *Springer* v. *U S.* 12 Otto, 586; *Keely* v. *Sanders*, 9 Otto, 441; *Sherry* v. *McKinley*, 9 Otto, 496.) The tax list has the force of an execution in the hands of the collector. (Burroughs on Taxation, p. 269.) Therefore, the treasurer, in the case at bar, was as if he had an execution, which presupposes a judgment by due process of law prior to its issuance. (See, also, Cooley on Taxation, 302, 303, 305, 306, 414; Desty on Taxation, p. 745, § 129; pp. 759, 760; also upon the subject generally, *U. S.* v. *Distillery*, 2 Abb. U. S. 192; *McGregor* v. *Montgomery*, 4 Pa. St. 237; *Moore* v. *Marsh*, 60 Pa. St. 46; *Henry* v. *Horstick*, 9 Watts, 412; *Smeich* v. *York Co.* 68 Pa. St. 439; *Atl. & Pac. R. R. Co.* v. *Cleino*, 2 Dill, 175; *Isaacs* v. *Decker*, 41 Ind. 410; *The Ann*, 8 Fed. Rep. 923, and cases there cited; *Smith* v.

*Maryland,* 18 How. 75; *Murray* v. *Hoboken L. & I. Co.* 18 How. 272.) The judgment should also be set aside on the ground that it gives the plaintiff two hundred and thirty-five dollars special damages for the detention of the piano; whereas, he is entitled to only interest on its value, even if the piano had been in the possession of defendant since the alleged taking; but the piano has not been in the possession of the defendant since January 7, 1887; nor does the *evidence* show that defendant has been in possession of the piano since it was taken by the sheriff on replevin. (*Phelps* v. *Owens,* 11 Cal. 23; *Dorscy* v. *Manlove,* 14 Cal. 555; *Hamer* v. *Hathaway,* 33 Cal. 117; *N. Y. G. & I. Co.* v. *Flynn,* 55 N. Y. 653; *Brizsee* v. *Maybee,* 21 Wend. 144; *Farmers' Bank* v. *McKee,* 2 Pa. St. 318; Sedgwick on Damages, 582.) In any event, plaintiff can recover special damages only to the commencement of the action. (*Powers* v. *Ware,* 4 Pick. 107; *Pierce* v. *Woodward,* 6 Pick. 207; *Leffingwell* v. *Elliott,* 10 Pick. 204.) Special damages accruing after the commencement of the action should have been pleaded by supplemental complaint. (Code Civ. Proc. Comp. Laws, § 111.) This was not done. Special damages, after the commencement of the action, are not demanded in the complaint.

*McBride & Haldorn,* for Respondent.

Appellant argues that the statute referred to creates only a lien, and is therefore not open to the objection urged to confiscations made by the author in Waples' Proceedings in Rem; but if the statute authorizes a seizure and sale, and in the case at bar plaintiff's property has actually been seized and sold, and plaintiff deprived of its possession, the result is the same whether the act is called the taking of property under a lien or confiscation. The difference between the Montana statute and the United States statute as to forfeiture is, that the United States statutes provide for notice to the owner and a hearing upon the merits before a forfeiture can be declared. (Rev. Stats. §§ 563–734, 3453–3460; *Windsor* v. *McVeigh,* 93 U. S. 277.) In *Sears* v. *Cottrell,* 5 Mich. 251, cited by appellant, the Michigan law was upheld by two of the Supreme Court judges, upon the ground that the law which authorized the taking had at the same time provided a remedy to the true owner against the delinquent. The third judge of the

Michigan Supreme Court filed a dissenting opinion, holding that the law was unconstitutional. And in *Travers* v. *Inslee*, 19 Mich. 98, a position is taken somewhat different from that held by the majority of the court in *Sears* v. *Cottrell, supra*. All that *Sheldon* v. *Van Buskirk*, 2 N. Y. 473, decides is, that the action of replevin could not, under the New York law, be maintained against the officer. It does not decide that by such sale the officer confers a good title. A tax warrant, regular upon its face, may protect the officer, but not the purchaser of the property seized and sold. The purpose of such a statute is to prevent property being taken from the custody of the law by replevin. The purchaser in such case, like the purchaser at a judicial sale, must be left to defend upon the title he thereby acquires. (*Power* v. *Kindschi*, 58 Wis. 539; 46 Am. Rep. 652–657, and cases cited in the opinion.) *Dungan's Appeal*, 68 Pa. 204; 8 Am. Rep. 169, cited by appellant, is not in point. In that case the taxes were due from Rogers, and in a judicial investigation it was decided that the government lien for taxes on property belonging to Rogers was superior to the lien of an execution levy. The execution ran against Rogers, but the levy had not been made until after the government lien attached. *Bennett* v. *Hunter*, 9 Wall. 326, cited by appellant, is not in point. In that case the tax was assessed against the land. The court, in its opinion, intimates that the procedure to collect this tax was unusually harsh, and still that harsh law did not go to the extent of taking the property of one man to pay the debt of another. Neither *Springer* v. *U. S.* 12 Otto, 586; *Keely* v. *Sanders*, 9 Otto, 441; nor *Sherry* v. *McKinley*, 9 Otto 496, are in point. In each of the said cases, only the property of the man who owed the tax was sold to pay the tax. In the two cases in 9 Otto, the tax was a land tax assessed against the specific land sold. Appellant says that "the tax list has the force of an execution in the hands of the collector," citing Burroughs on Taxation, page 269. An execution, of course, names the judgment debtor, and commands the officer to levy upon his property, not on the property of a stranger to the writ. Therefore, the treasurer, who is not a party to the case at bar, if he had had a tax list, might have made a levy upon the property of Osborne, but had no right to levy upon the property of Chauvin. Desty on Taxation, as cited by

appellant, is only authority for the proposition that a tax warrant issued to the collecting officer is essential to his authority in the enforcement of the tax lien, and if legal on its face, will protect him against any illegality or irregularity except his own. On page 305 of Cooley on Taxation, cited by appellant, we find the following: " If one man's land is taxed to another and sold, the sale is void, and cannot be made otherwise by legislation." (Citing, *Abbot* v. *Lindenbower*, 42 Mo. 162.) And the entire scope of the citation in Cooley seems to be concerning the legal effect of curative statutes. As to other cases cited by the appellant, *Smith* v. *Maryland*, 18 How. 75, was as to the forfeiture of a sloop. The law provided that before judgment of forfeiture there should be a judicial hearing. (See statement of the case on pp. 72, 73.) The same may be said of *The Ann*, 8 Fed. Rep. 923; and further, that it announces an entirely different doctrine from the one announced by appellant. On page 927 we find the following, quoting from 9 Cranch, 144: " ' The whole world, it is said, are parties in an admiralty cause. . . . . Where proceedings are against the person, notice is served personally or by publication; when they are *in rem*, notice is served upon the thing itself. . . . .' But it is also a just qualification of the foregoing rule that, unless the party to be affected by the actual or constructive notice would, if he had appeared, have been allowed to assert his right and be heard in its defense, the proceeding cannot affect him." (Citing, *Windsor* v. *McVeigh*, 93 U. S. 277; *Bradstreet* v. *Ins. Co.* 3 Sum. 607; *The Henrietta*, 1 Newb. 292.) *Murray* v. *Hoboken L. & I. Co.* 18 How. 272, cited by appellant, is in reference to the collection of certain money due from a defaulting official to the United States by process provided by act of Congress for making summary levy upon the property of defaulting officials. Under said act only the property of the defaulting official could be taken for his shortage; there was no attempt to take the property of a stranger. The statute providing for the seizure of plaintiff's property to satisfy a license due from a third party, and giving plaintiff no opportunity to be heard in his own defense, is a taking of property "without due process of law." (*Lowry* v. *Rainwater*, 70 Mo. 152; 35 Am. Rep. 420; *Ieck* v. *Anderson*, 57 Cal. 251; 40 Am. Rep. 115; Cooley's Constitutional Limitations, p. 362; Tiedeman on Limitation of Police Power, p.

498; *Fisher* v. *McGirr*, 1 Gray, 1; 61 Am. Dec. 381; *Stuart* v. *Palmer*, 74 N. Y. 183; 30 Am. Rep. 289; *Hutson* v. *Woodbridge Protection District*, Cal. Feb. 13, 1888; *County of San Mateo* v. *S. P. R. R. Co.* 8 Sawy. 238; *Thomas* v. *Gain*, 35 Mich. 155; 24 Am. Rep. 535–540; *Windsor* v. *McVeigh*, 93 U. S. 274.) The statement that defendant had not been in possession of the piano since January 7, A. D. 1887, is not correct, as the evidence shows. No such position was taken by appellant in the lower court. Appellant in "the specification of errors that he would rely upon," does not raise the point that defendant had not been in possession of the said piano since January 7, A. D. 1887; what he objects to is that a wrong rule for the measure of damages was adopted by the court, claiming that interest on the value of the piano from the time of the taking up to the time of the trial was the true measure of damages. Appellant cannot raise an objection in this court not set out in his specifications of errors and not raised by him in the lower court. (*Stafford* v. *Hornbuckle*, 3 Mont. 485.) The great weight of authorities support the proposition that in an action in the nature of replevin, where the property taken has a usable value and a party is entitled to the property, he is also entitled to recover the value of its use from the time he was deprived of it to the day of trial. (*Morgan* v. *Reynolds*, 1 Mont. 167; Wells on Replevin, §§ 520, 579; *Allen* v. *Fox*, 51 N. Y. 562; 10 Am. Rep. 641; *Hanauer* v. *Bartels*, 2 Colo. 524; *Fralick* v. *Presly*, 29 Ala. 463; 65 Am. Dec. 413; *Williams* v. *Phelps*, 16 Wis. 85; *Yandle* v. *Kingsbury*, 17 Kan. 195; 22 Am. Rep. 282; *Ladd* v. *Brewer*, 17 Kan. 204; *Bell* v. *Campbell*, 17 Kan. 211; *Butler* v. *Mehrling*, 15 Ill. 488; *Hudson* v. *Young*, 25 Ala. 376.) Such damages are assessed up to the rendition of judgment, and are assessed like interest on a note. (Wells on Replevin, § 225; *Wash. Ice Co.* v. *Webster*, 62 Me. 341; 16 Am. Rep. 462.)

McConnell, C. J. — The action is for replevin for one piano. The defendant establishes title by purchase from the treasurer of the county, on a sale under the provisions of section 816, Revised Statutes, Montana. The case was tried by the court without a jury. Findings of fact and conclusions of law were filed by the court and entered for the plaintiff, for the possession

of the property, special damages for its detention and costs; from which judgment defendant now appeals to this court.

The facts as pleaded, proved and found by the court in its findings of fact, are as follows, to wit: That from June 6 to December 6, 1886, Harry Osborne was a retail liquor dealer in the City of Butte, Silver Bow County; that during all that time, Osborne held and used the piano in said business; that under section 801, Revised Statutes (then in force) Osborne was indebted to said county in the sum of one hundred and twenty dollars, as license, which he never paid; that Harry C. Kessler was at said time treasurer of said county; that said treasurer seized said piano on December 23, 1886, to satisfy said license and costs of seizure—this under section 816, Revised Statutes; that afterward the treasurer advertised and sold said piano, in strict conformity with the laws as to sales of personal property on execution, as provided by section 816; that on said sale the defendant, Valiton, was the purchaser; that said taking was the taking complained of, and the only taking by defendant.

The court gave judgment for the plaintiff below upon the ground that the said section 816 is unconstitutional and void, and hence the purchaser at the treasurer's sale got no title to the piano in controversy. Appellant also insists that the court below erred in the rule adopted as to the measure of damages for the detention of the piano. The constitutionality of said act, and the proper rule of damages for the detention of property in replevin cases, are the only questions to be determined in this case.

1. Section 816 of the Revision of 1879 is at follows, to wit: "For the purpose of enforcing the provisions of this chapter, and to prevent the evasion of the same, all property of every kind, held or used in any of the trades, occupations, or professions, for which a license is required by the provisions of this chapter, shall be liable for said license; and said license is hereby made a lien on all such property, which lien shall have precedence of any other lien, claim, or demand; and if any person or persons shall fail or refuse to procure the license required by this chapter before the transaction of the business specified, it shall be the duty of the treasurer of the county to seize any of the property upon which a lien is hereby created, or any other

property belonging to such person or persons, and sell the same in the manner provided for sheriffs on execution to satisfy said license and costs." By reference to chapter 40, in which said section 816 is contained, it will be seen that this section applies to twenty different occupations or pursuits. And all property held or used in any of them is made liable for the license tax which is imposed by said chapter upon said several callings, and a lien is declared upon said property, and it is made the duty of the treasurer to seize it and sell it in the "manner provided for sheriffs on executions" to satisfy said liens and costs. There is no provision for the owner to be heard; no notice is to be given him; he has no day in court; he may have honestly paid the taxes on the same property; still it is made subject to the taxes due from another, who, because it is held and used by him in his business, is enabled through the agency of this statute to pay his debts to the government with it. The owner is in no fault; he may not know that the delinquent has it in his possession or uses it in his business. Such delinquent may have come into the possession of it by theft. The statute does not regard the manner in which it may have come into his possession and use. The law stamps its lien upon it by virtue of its being held and used in the business of the delinquent licensee. The treasurer armed with a copy of the assessment roll seizes it and sells it in the same manner that a sheriff levies an execution upon the property of a judgment debtor.

The question is, is this statute in conflict with the fifth and fourteenth amendments to the Constitution of the United States? The fifth amendment to the Constitution of the United States provides that no person shall be "deprived of life, liberty, or property, without due process of law." And the fourteenth amendment provides that no "State shall deprive any person of life, liberty, or property, without due process of law." The people of this country were not satisfied with the first provision in their great Organic Act; but in 1866 prohibited the States from making any law that would deprive their citizens of life, liberty, or property, without due process of law. Those provisions, the most sacred of all the constitutional rights of the people of this country, are a limitation upon arbitrary power. They are intended to prohibit arbitrary and unjust legis-

lation. They imply the right of the government to deprive of life, liberty, and property; but this cannot be done " without due process of law." It becomes vital, then, to know what is meant by the phrase " due process of law." It is hard to give a comprehensive definition of it that will embrace all the cases that arise. More than a hundred years have elapsed since it was first incorporated in the Constitution, and still the courts are engaged in giving a definition of its meaning.

In commenting upon its meaning, Mr. Justice Miller, in the case of *Davidson* v. *New Orleans,* 96 U. S. 104, says: "But apart from the imminent risk of a failure to give any definition which would be at once perspicuous, comprehensive, and satisfactory, there is wisdom, we think, in the ascertaining of the intent and application of such an important phrase in the Federal Constitution, by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." This learned judge further says: "That whenever by the laws of a State, or by State authority, a tax, assessment, servitude, or other burden is imposed upon property for the public use, whether it be for the whole State, or of some more limited portion of the community, and those laws provide for a mode of confirming or contesting the charge thus imposed in the ordinary courts of justice, with such notice to the person, or such proceedings in regard to the property as are appropriate to the nature of the case, the judgment in such proceedings cannot be said to deprive the owner of his property without due process of law, however obnoxious it may be to other objections." In the same case Mr. Justice Bradley, in a concurring opinion, gives this definition: "I think, therefore, we are entitled, under the fourteenth amendment, not only to see that there is some process of law, but 'due process of law,' provided by the State law when a citizen is deprived of his property; and that, in judging what is 'due process of law,' respect must be had to the cause and object of the taking, whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or none of these; and if found to be suitable or admissible in the special case, it may be adjudged to be 'due process of law,' but if found to be arbitrary, oppressive,

and unjust, it may be declared to be not 'due process of law.' Such an examination may be made without interfering with that large discretion which every legislative power has of making wide modifications in the forms of procedure in each case, according as the laws, habits, customs, and preferences of the people of the particular State may require." The court of appeals of the State of New York, in the case of *Stuart* v. *Palmer*, 74 N. Y. 183; 30 Am. Rep. 289, in speaking of the meaning of "due process of law," in construing a statute of that State upon the question of notice necessary in the assessment of property for taxes, uses the following language, to wit: "It is a rule founded on the first principles of natural justice, older than written constitutions, that a citizen shall not be deprived of his life, liberty, or property without an opportunity to be heard in defense of his rights, and the constitutional provision that no person shall be deprived of these 'without due process of law' has its foundation in this rule. . . . . No citizen shall arbitrarily be deprived of his life, liberty, or property. This the legislature cannot do nor authorize to be done. 'Due process of law' is not confined to judicial proceedings, but extends to every case which may deprive a citizen of life, liberty, or property, whether the proceeding be judicial, administrative, or executive in its nature." And that learned court thus defines the meaning of "due process of law," to wit: "It may, however, be stated generally that due process of law requires an orderly proceeding adapted to the nature of the case in which the citizen has an opportunity to be heard, and to defend, protect, and enforce his rights. A hearing, or an opportunity to be heard, is absolutely essential. We cannot conceive of due process of law without this." In the celebrated *Dartmouth College Case*, 4 Wheat. 519, Mr. Webster defined "due process of law" as a proceeding " which proceeds upon inquiry and renders judgment only after trial." Judge Cooley, in his work on Constitutional Limitations, page 355, says that "due process of law" is not confined to ordinary judicial proceedings, but extends to all cases where property is sought to be taken or interfered with, and that due process of law in each particular case means such an exertion of the powers of the government as the settled maxims of law permit and sanction, and under such safeguards

for the protection of individual rights as these maxims prescribe for the class of cases to which the one in question belongs. . . . ." In the case of *Overing* v. *Foote,* 65 N. Y. 263, Mr. Commissioner Reynolds says: "The general theory under our laws for taxation of property is that the citizen to be affected must have some sort of notice of the proceeding to be had against his property, and that in some form he may be heard, if wrong is apprehended, before any portion of his estate is seized for the support of government; and I think all our laws for the assessment of property for the purpose of taxation are founded upon this notion of justice. . . . ."

. We might multiply authorities upon this subject almost indefinitely, but we think the foregoing are sufficient to show the current of authority upon this subject; and we hold that the doctrine laid down in the case of *Overing* v. *Foote, supra,* to wit, "that some sort of notice of the proceeding to be had against his property, and that in some form he may be heard if wrong is apprehended before any portion of his estate is seized for the support of the government," is the constitutional right of every citizen, and if he is not given this opportunity, and his property is taken from him, it is done without due process of law, and is an infraction of the foregoing provisions of the Federal Constitution.

When we examine said section 816, under consideration, in the light of these constitutional provisions, it is conspicuous for the absence of "due process of law." It provides that the property of another held or used in any of the twenty occupations provided for in said chapter may be seized by the treasurer, and sold for the satisfaction of the license due from the person so holding or using it, and costs, without any notice to the owner, without any trial, without any opportunity to be heard, and leaves such person without any remedy whatever. It seems to us that it would have been difficult for the legislature to have devised a more arbitrary and unjust law than this. The owner of the property may not know that it is held or used by the delinquent tax-payer. Indeed, it might have come into the possession of such tax-payer by theft or fraud, and the bare fact that it is held and used in such trade or occupation without any reference to the manner in which it came into his possession,

subjects it to the lien for the license fee, to be sold by the treasurer in the manner heretofore described. Such a law is against reason; it violates every sense of justice and of right. Such procedure occurring between private citizens would be regarded as gross fraud, if not theft, and when done by the government, it cannot be characterized by a milder term than tyranny.

We are aware that the taxing power is the most comprehensive and unrestricted of all the powers with which government is endowed. This must necessarily be the case, because of the necessity of the government to raise revenue to carry on the purposes of the government. In this country, the power of the legislative departments of the governments, federal and State, is limited by written constitutions, and the English doctrine of parliamentary omnipotence has no place in American institutions. Mr. Cooley, in his work on Taxation, speaking upon this subject, says: "That no attribute of sovereignty is more pervading, and at no point does the power of the government affect more constantly and intimately all the relations of life than through the exactions made upon it for taxation. The power of taxation rests upon necessity, and is inherent in every sovereignty. No constitutional government can exist without it. Chief Justice Marshall has said of this power, 'that the power of taxing property is essential to the very existence of government, and may be legitimately exercised on the subjects to which it is applicable to the utmost extent to which the government may choose to carry it.' The only security against the abuse of this power is found in the structure of the government itself. In imposing the tax, the legislature acts upon its constituents." (*McCulloch* v. *State*, 4 Wheat. 435.) This vital power may be abused, but the interest, wisdom, and justice of the representative body, and its relations to its constituents, furnish the only safety against unjust and excessive taxation, as well as unwise taxation. Again, Mr. Cooley, in his work on Taxation, in speaking of the collection of taxes by distress, says: "That it has been objected to as a process which condemned the party before he had been heard, and proceeded to execution without trial. In a very important sense, the objection states the case with accuracy. The process, in the nature of an execution, does issue, at least under some tax laws, before the liability of the party has been finally and

conclusively determined." And he quotes approvingly the following from Judge Knott, in the case of *State* v. *Allen,* 2 McCord, 55: "This method of collecting taxes is as well established by custom and usage as any principle of the common law. A similar practice prevailed in all the colonies from the first dawn of their existence. It has been continued by all the States since their independence, and had existed in England from time immemorial. Indeed, it is necessary to the existence of every government, and is based upon the principle of self-preservation. . . . . I think, therefore, that any legal process that was founded on necessity has been consecrated by time, and approved and acquiesced in by universal consent, must be an exception to the right of trial by jury, and is embraced in the alternative, the law of the land. Such, I consider, to be the summary proceedings allowed in the collection of taxes." In commenting upon this, Mr. Cooley says: "But it has sometimes been deemed necessary, after giving the ordinary remedy by distress, to go no further. That remedy will not justify any invasion of the rights or any interference with the property of others than the very persons upon whom the tax is imposed. If the property of another is distrained the officer may be sued in trespass, or the property may be taken from him on writ of replevin. Under pretense of this right it has been found possible seriously to embarrass the officer in the performance of his duties by means of unfounded claims, or those the officer believes to be such. To preclude this statutes have, in some cases, been passed, taking away the ordinary remedies against the collector and leaving the claimant to some other remedy. . . . ." It will be seen that the doctrine laid down here as that the summary remedy of seizure of property by distress warrants, without hearing or notice on the part of the alleged delinquent tax-payer, must be confined to the property of those who are delinquent, and that it will not justify any invasion of the rights or interference with the property of others. While, then, we recognize the all-pervading power of the government in the assessment and collection of taxes, and that it reaches all classes of persons and all classes of property, and while we further recognize the necessity of the government not being interfered with in the collection of its revenues by the ordinary delays incident to trials in courts of justice, and

that the legislature has the power to give extraordinary reme-
dies, summary in their nature, to revenue collecting officers, to
the end that the taxes may be speedily gathered, and thus the
necessities of the government be promptly met; still, it does
not go to the extent of the doctrine of English parliamentary
omnipotence, and the legislature in the exercise of this power
has no right to trample under its foot the provisions of the Con-
stitution under consideration.

In some cases it has been claimed that the expression "due
process of law" is synonymous with that other expression "law
of land," and that was the meaning attached to it by so eminent
an authority as Lord Coke.    In commenting upon this point, Mr.
Justice Miller, in the case of *Davidson* v. *New Orleans, supra,*
uses the following language: "The equivalent of the phrase
'due process of law,' according to Lord Coke, is found in the
words 'law of the land,' in the Great Charter, in connection with
the writ of habeas corpus, the trial by jury, and other guaran-
tees of the rights of the subject against the oppression of the
crown.    It is easy to see that when the great barons of England
wrung from King John, at the point of the sword, the conces-
sion that neither their lives nor their property should be disposed
of by the crown, except as provided by the law of the land, they
meant by 'law of the land,' the ancient and customary laws of
the English people, or laws enacted by the Parliament of which
those barons were a controlling element.    But when in the year
of grace, 1866, there is placed in the Constitution of the United
States a declaration that 'no State shall deprive any person of
life, liberty, or property without due process of law,' can a State
make anything due process of law which, by its own legislation,
it chooses to declare such?    To affirm this is to hold that the
prohibition to the States is of no avail, or has no application
where the invasion of private rights is affected under the forms
of State legislation."    No one, then, will claim that the meaning
of this expression, "the law of the land," as used in the days of
Lord Coke, is the correct meaning to be attached to it at this
time and in this country.    Otherwise, to hold so, would be to
make any law, however arbitrary and violative of fundamental
principles, which the legislature might see fit to make of a
general nature, the law of the land, and hence proceedings under

it and rights divested under it would be done by " due process of law." Such a construction of the Constitution would result in its total destruction, and confer upon the American legislatures all the power that the English Parliament ever had, and instead of the citizen finding his life, liberty, and property protected by the Constitution, he would find himself at the mercy of the legislative department of the government. And this is the mistake into which the Supreme Court of Michigan fell in the case of *Sears* v. *Cottrell*, 5 Mich. 250, in which Judge Manning spoke for a majority of the court, and laid down the following doctrine: " The words ' due process of law ' mean the 'law of the land,' and are to be so understood in the Constitution. By Magna Charta, it was provided: 'No freeman shall be taken or imprisoned or dispossessed of his free tenement and liberties, or outlawed, or banished, or anywise hurt or injured, unless by the legal judgment of his peers, or by the law of the land.' Lord Coke construed the words 'law of the land' to mean due process of law. Hence we sometimes find one phraseology used and sometimes the other. They were held, and we think correctly, to mean the same thing in the *Matter of John and Cherry Streets*, 19 Wend. 659. By the ' law of the land ' we understand laws that are general in their operation, and that affect the rights of all alike, and not a special act of the legislature, passed to affect the rights of an individual against his will, and in a way in which the same rights of other persons are not affected by existing laws." We cannot consent to the doctrine of this Michigan case, for the reasons that we have already given, that in carrying it out, it will subordinate the Constitution to the legislative will, and subject the citizen in the enjoyment of life, liberty, and property to the caprices of that will. Nothing can be the law of the land in the sense of the Constitution, however general it may be, and however it may affect the rights of all persons alike, which deprives the citizen of his life, his liberty, or his property, without due process of law; and that, as we have already seen, contemplates that a hearing must be allowed to him at some stage of the proceedings against him, and a hearing would be but a hollow mockery if he could not be allowed to defend and be protected in his rights by the judgment of the court, or the administrative or executive officer with

whom he has to do. In the case of *Sears* v. *Cottrell, supra,* the statute under consideration, like our own section 816, provided that the mere possession of personal property should make it liable for the taxes of the person who so held it in possession, and the Supreme Court of Michigan held such an act constitutional upon the grounds above given; but even this statute gave to the person whose property might be sold for the taxes of another, a right of action against such person to recover the value of it; so that its harshness at least was in some measure mitigated by the remedy thus given.

2. The court below gave judgment for the unlawful detention of the piano in controversy at the sum of two hundred and thirty-five dollars. It is contended by the appellant that the true measure of damages is interest on the value of the property from the time it is taken up to the time of the rendition of the judgment; while the respondent contends that if the property replevied has a usable value, the party entitled to the property has also the right to recover the value of its use from the time he was deprived of it to the day of trial. The proof showed, in this instance, and the court so found, that the rental value of the piano in question was ten dollars per month, and the court allowed as damages this rental value. In this we think there is no error. The great weight of authority sustains this position, and we think it is founded in reason and justice, and the authorities referred to in respondent's brief, also, abundantly sustain this position.

Let the case then be affirmed at the cost of the appellant.

*Judgment affirmed.*

Bach, J., and Liddell, J., concur.