STATE, Respondent, *v.* PENNY, Appellant.

(No. 2,873.)

(Submitted September 26, 1910. Decided October 20, 1910.)

[111 Pac. 727.]

*Criminal Law—Theaters—Keeping Open on Sunday—Statutory Construction—Police Power—Moving Picture Shows.*

Criminal Law—Statutes—Construction.
1.  Revised Codes, section 8369, making the keeping open and maintaining of a theater or playhouse on Sunday a misdemeanor, so far as it is penal, is to be construed in accordance with section 8096, which provides that the rule of the common law that penal statutes are to be strictly construed has no application to the Code, and that all its provisions are to be construed according to the fair import of their terms with a view to effect its object and to promote justice.

Same—Sunday Theater—Statutory Construction.
2.  Revised Codes, section 8369, making the keeping open and maintaining of a theater or playhouse on Sunday a misdemeanor, is not directed toward the keeping open and maintaining of a theater building, but refers to the class of entertainment or performance therein, or in some other manner, furnished.

Same—Statutory Offenses—Evidence.
3.  In a prosecution for keeping open and maintaining a theater on Sunday in violation of Revised Codes, section 8369, making such action a misdemeanor, the fact that the show is sometimes called a theater is immaterial where there is also a particular description of the class of entertainment furnished.

Same—Amusements—Statutes—Police Power.
4.  Laws relating to Sunday performance of theaters and playhouses are laws passed in the exercise of the police power for the promotion of the public peace, order, and morals.

Same—Regulation Statutes—Police Power—Presumption.
5.  Penal statutes enacted in the exercise of the police power in relation to the keeping open and maintaining of theaters, playhouses, and other amusements on Sunday, are presumed to be reasonable as enacted.

Same—Constitutional Law—"Police Power."
6.  The "police power" is a term which has relation to a power to enact a system of regulations tending to the health, order, convenience, and comfort of the state's inhabitants and to the prevention and punishment of public injuries and offenses.

Same—Theaters and Shows—Statutes—Moving Pictures—Sunday Performances.
7.  The operation of a moving picture show on Sunday in which the pictures shown were of a clean and moral character, were approved by a general board of censors located in another state, and were accompanied by piano selections and vocal music, is not a violation of Revised Codes, section 8369, making every person who on Sunday, or the first day of the week, keeps open or maintains or aids in opening or maintaining any theater, playhouse, dance-house, racetrack, gambling-house, concert saloon, or variety hall, guilty of a misdemeanor.

Same—Statutes—"Theater"—"Show."
   8.   The word "theater," as used in section 8369, Revised Codes, making
   it a misdemeanor to keep open and maintain a theater on Sunday,
   means a theatrical performance or entertainment and does not include
   all shows, though a "show" includes a theatrical performance.

*Appeal from District Court, Missoula County; F. C. Webster, Judge.*

T. C. PENNY was convicted for keeping open and maintaining a theater on Sunday, and he appeals from the judgment of conviction and an order denying him a new trial. Reversed and remanded.

*Messrs. Marshall & Stiff,* and *Mr. Floyd J. Logan,* submitted a brief in behalf of Appellant. *Mr. Logan* and *Mr. Stiff* argued the cause orally.

In behalf of the State, there was a brief by *Mr. Albert J. Galen,* Attorney General, and *Mr. J. A. Poore,* Assistant Attorney General; *Mr. Poore* argued the cause orally.

MR. JUSTICE SMITH delivered the opinion of the court.

The defendant was convicted and fined in Missoula county for keeping open and maintaining a theater on Sunday, contrary to the provisions of section 8369 of the Revised Codes. That section reads as follows: "Every person who on Sunday, or the first day of the week, keeps open or maintains or aids in opening or maintaining any theater, playhouse, dance-house, racetrack, gambling-house, concert saloon or variety hall is guilty of a misdemeanor."

The cause was submitted to the district court upon an agreed statement of facts, which reads as follows:

"That T. C. Penny, the defendant hereinabove named, is now and at all the times hereinafter mentioned was the manager and proprietor of the Bijou in the city and county of Missoula, state of Montana; that the Bijou is a moving picture show maintained, operated, and conducted at said city and county of Missoula at 110 West Main street, and on Sunday, the twenty-fourth day of

October, 1909, the defendant opened the said Bijou moving picture show and maintained the said picture show and continued to operate the same until he was arrested by the sheriff of Missoula county, Montana; that at the time of his said arrest the defendant was engaged in giving a moving picture exhibition, accompanying the same by piano music and a vocal solo; said moving picture exhibition consisted in throwing upon a screen at the front of the room, and in front of and in full view of the audience in the room, moving pictures by means of the operation of a machine which is known as a kinetoscope; that said room just referred to is and was located in the Bijou; that the said moving pictures are thrown upon the screen by reason of the running of films of pictures through the kinetoscope; that on the aforesaid date there was by the said defendant, by and through one of his employees, run through the said kinetoscope four sets of films, throwing the pictures contained in said films on the screen hereinbefore referred to and thereby making the moving pictures, the exhibition of which is complained of by the criminal authorities of Missoula county, as constituting together with the piano music and vocal solo then and there rendered, together with the other facts herein agreed upon, the opening and maintaining of a theater on Sunday; the names of the four sets of films of moving pictures which were run and are above referred to are as follows, to wit: Samson and Goliath, which depicted on the screen what is known as a sacred scene; A New Life, which pictured what is known as a moral scene; Fools of Fate, which pictured what is known as a moral scene; and It's an Ill Wind that Blows Nobody Some Good, which pictured on the screen a comical scene.

"That throughout at least a portion of the time that the said moving pictures were being exhibited as aforesaid, one of the employees of the defendant played the piano and furnished instrumental music to accompany the exhibition of the said pictures; that at one period intervening between the exhibition of two of the above-named films of pictures one of the employees of defendant sang a vocal solo, accompanied by music on the

piano, being played by another of the employees of the said defendant, which said solo was entitled 'The Songs My Mother Used to Sing.'

"That tickets were sold admitting people to the Bijou on said Sunday evening and at the time of defendant's arrest there were at least one hundred people congregated and seated inside the Bijou watching the said pictures and listening to the said music; that the price of admission was the sum of ten cents.

"That the pictures shown at said time and place were all of a clean and moral character; that all of the pictures shown by the Bijou are and were prior to being exhibited passed upon by what is known and called a 'Bureau of Censorship,' composed of five persons located in New York City; that said bureau passes on each picture in each film run by the Bijou before the said film is permitted to be run; and any unclean or immoral picture the said bureau requires to be removed from said film at once and before it is permitted to be run.

"That the defendant is being prosecuted under the provisions of section 8369 of the Revised Codes of 1907 of the state of Montana; that at the time of the enactment of said section moving pictures and moving picture machines were not in existence and were not known of; that there was an exhibition in front of the Bijou for a period of about two hours about noon of the 24th of October, 1909, and there has been exhibited thereat on four or five other occasions prior thereto for a short period, an advertising board about three feet high and about four feet wide, having, by means of canvas and painting on said canvas, printed thereon the letters and words 'Bijou Theater,' and some other advertising matter.

"That the defendant pays to the city of Missoula, Montana, money for a license granted by said city under an ordinance of said city requiring licenses to be secured for the operation of theaters; that said city of Missoula has and had no ordinance requiring or providing for licenses to be granted to moving picture shows, and that there was no ordinance on the ordinance books of the city of Missoula on the twenty-fourth day of Octo-

ber, 1909, permitting or authorizing any person to secure a license for the operation of a moving picture exhibition or moving picture show.

"That the defendant on one occasion permitted an advertisement to be run and placed with his consent on an oilcloth banner about eight inches wide by eighteen inches long, the heading for which said banner was 'Missoula's Leading Business Men'; the advertisement of defendant, which appeared among many others, was in part as follows, to wit: 'Come to the Bijou Theater and see the best entertainment in the city.' Charles Harnois is the proprietor of the Harnois Theater, sometimes called the Harnois Opera House. In an edition of the 'Daily Missoulian,' a newspaper published in the city and county of Missoula, of about September 12, 1909, said Charles Harnois advertised that he was the proprietor of and had the only theater in Missoula. Said Harnois has been in the theater business for more than fifteen years.

"That the Bijou is by some regarded and spoken of as 'the ten-cent show,' and as the 'Bijou'; that among some it is regarded and spoken of as 'the ten-cent theater' and as the 'Bijou Theater'; that in the building which is occupied by the Bijou, referring particularly to the room where the exhibition is made, there are a number of seats and there are two aisles; the floor has a moderate descent as it nears the front portion of the room where the screen is, so that those in the rear can observe the exhibition as well as those in front without inconvenience; that there is an elevation in the floor of from two to two and one-half feet forming a platform where the screen is; that the curtain which forms the screen on which the pictures are thrown reaches from the ceiling to the floor of the platform and is immovable; there are no boxes; there is no balcony or gallery; there is an elevation in the rear where the kinetoscope stands.

"That in the columns of each of the two daily newspapers in the city of Missoula there is maintained a column headed 'In the Theaters,' and the 'Bijou' and the attractions thereat are usually

mentioned in said columns. Sometimes the 'Bijou' is called the 'Bijou Moving Picture show.' ''

Defendant appeals from the judgment and also from an order of the court refusing to grant a new trial.

The sole question for determination is, whether the agreed statement of facts is sufficient to warrant the conclusion that the defendant was guilty of keeping open and maintaining a theater, contrary to the provisions of section 8369, Revised Codes, *supra*. In so far as this statute is penal in character, it is to be construed in accordance with the provisions of section 8096 of the Revised Codes, which reads as follows: ''The rule of the common law, that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its object and to promote justice.''

1. The attorney general's first contention is that the word ''theater,'' in the statute refers to the building, and he cites the following definitions of the word, *viz.:*

''Any room adapted to the exhibition of any performance before an assembly, as for public lectures, for scholastic exercises, for anatomical demonstrations or surgical operations before a class, and like purposes.'' (Webster's Dictionary.)

''A building especially adapted to dramatic, operatic, or spectacular representations; a playhouse, a room or hall arranged with seats that rise as they recede from a platform at one side, especially adapted to lectures, to the exhibition to classes of anatomical or surgical demonstrations,'' *etc.* (Standard Dictionary.)

''A theater is defined to be a building appropriated to the representation of dramatic spectacles, a place for shows, a playhouse.'' (*Commonwealth* v. *Fox,* 10 Phila. (Pa.) 204.)

We are, however, satisfied that our statute was not intended to apply to the act of keeping open or maintaining the building called a ''theater,'' but refers rather to the class of entertainment therein, or in some other manner, furnished. It is not to be supposed that the legislature intended to prohibit the mere

opening of a theater building at a time when no performance of any kind was being given. There is no reason that we can think of why such an act should be prohibited or punished. The opening of an empty theater building on Sunday would in no wise affect either the public morals or the good order of a community. This being so, it follows that those portions of the agreed statement of facts wherein a description of the physical condition and equipment of the so-called "Bijou" theater, or moving picture show is set forth, are immaterial.

2. The only other question is: Does the operation of a moving picture show on Sunday violate the statute prohibiting the opening or maintaining of a theater on Sunday? The mere fact that the show was sometimes called a "theater" is of no consequence, in view of the further fact that we have before us a particular description of the class of entertainment furnished. If the show was a theatrical performance, the statute would be violated if it were maintained in a place other than a theater building, as, for instance, in the open air. If the giving of a moving picture show was in terms prohibited by the statute, the courts would be bound by the words employed and there would be no occasion to construe the legislative language. As this form of entertainment is not mentioned, on account of the fact, probably, that shows of the kind were unknown and unthought of at the time the law was enacted, it is the duty of the court in seeking the legislative meaning, to first ascertain the reason for the enactment of the law. If the giving of a moving picture show falls fairly within the class of evils sought to be suppressed, then the act is prohibited whether such a show is mentioned in the law or not. (See *John* v. *Northern Pacific Ry. Co., ante,* p. 18, 111 Pac. 632.)

The law certainly prohibits the giving of a theatrical performance, as such. Therefore that feature of it may not be questioned. Doubtless the legislative assembly considered that such a show ought not to be permitted on Sunday. But we must seek the reason for such a conclusion in order to ascertain whether a show not specifically mentioned is also prohibited.

These and similar laws are passed in the exercise of the police power of the state. They are presumed to be reasonable as enacted. We take the following from 31 Cyc., page 902: "Police power, strictly speaking, a term which has relation to a power of organization of a system of regulations tending to the health, order, convenience, and comfort of the inhabitants, and to the prevention and punishment of injuries and offenses to the public."

"It is within the power of the legislature to make police regulations relative to the hours and modes of occupying places of amusement. * * * The state has the right to pass statutes prohibiting any sort of public exhibition or amusement on Sunday, in order to preserve peace and order." (28 Am. & Eng. Ency. of Law, 2d ed., 118.) "The legislature has the right to prohibit acts injurious to the public and subversive of the government, or which tend to the destruction of the morals of the people and disturb the peace and good order of society." (*Lindenmuller* v. *People,* 33 Barb. (N. Y.) 548; see, also, *Neuendorff* v. *Duryea,* 69 N. Y. 557, 25 Am. Rep. 235; *St. Louis A. & M. Assn.* v. *Delano,* 108 Mo. 217, 18 S. W. 1101; *State* v. *Hogreiver,* 152 Ind. 652, 53 N. E. 921, 45 L. R. A. 504; *State* v. *Powell,* 58 Ohio St. 324, 50 N. E. 900, 41 L. R. A. 854.)

It is undoubtedly by virtue of the police power that theater performances on Sunday are prohibited. They are not *mala in se.* Such performances cannot affect the health, convenience, or comfort of the inhabitants, unless they are so boisterous in their nature as to be a disturbing element; therefore it must be that they are prohibited for the purpose of preserving the peace, order, and good morals of the community. The chapter in which section 8369, Revised Codes, is found, is entitled: "Offenses Against Good Morals." It may perhaps be admitted that the legislature has power to prohibit the exhibition of all moving pictures, or pictures of a particular description, on Sunday, or demoralizing scenes on any other day; but as it has not in terms done so, such a show is not prohibited, unless

it falls within that class of entertainment which tends to disturb the peace, quiet, good order, or morals of a community.

The statement of facts discloses that the pictures shown at the time and place mentioned in the complaint were all of a clean and moral character and had been approved by a so-called "board of censorship," which had the power to prohibit and did prohibit the exhibition of any unclean or immoral scene or picture; the moving pictures were accompanied by piano music, and, as a part of the performance, a vocal solo of a sentimental nature, accompanied by music on the piano, was sung. We cannot perceive how this sort of an entertainment could possibly affect either the morals or the good order of the city of Missoula or its inhabitants. It appears to us to have been an innocent amusement having a tendency to instruct, rather than to demoralize or disturb; and as the legislature has not seen fit to prohibit it, the courts ought not to do so. (*Ex parte Hull,* 18 Idaho, 475, 110 Pac. 256.)

In the case of *Moore* v. *Owen,* 58 Misc. Rep. 332, 109 N. Y. Supp. 585, the court held that a moving picture exhibition was a "show" within the meaning of a statute prohibiting shows on the first day of the week. (See *Economopoulos* v. *Bingham,* 109 N. Y. Supp. 728.) But our statute does not prohibit the opening or maintaining of a "show." It specifically mentions a "theater," which, as we have held, means a theatrical performance. While the word "show" may, and undoubtedly does, include a theatrical performance, the word "theater" is not sufficiently comprehensive to include all "shows." The following cases are more or less in point on the subject: *Bell* v. *Mahn,* 121 Pa. 225, 6 Am. St. Rep. 786, 15 Atl. 523, 1 L. R. A. 364; *Jacko* v. *State,* 22 Ala. 73; *Eden Musee Am. Co.* v. *Bingham,* 58 Misc. Rep. 644, 108 N. Y. Supp. 200; *Keith & Proctor A. Co.* v. *Bingham,* 108 N. Y. Supp. 205; *Weistblatt* v. *Bingham,* 58 Misc. Rep. 328, 109 N. Y. Supp. 545; *People* v. *Hemleb,* 127 App. Div. 356, 111 N. Y. Supp. 690; *William Fox Amusement Co.* v. *McClellan,* 62 Misc. Rep. 100, 114 N. Y. Supp. 594.

The judgment and order of the district court are reversed and the cause is remanded, with instructions to dismiss the complaint.

*Reversed and remanded.*

Mr. Justice Holloway concurs.

Mr. Chief Justice Brantly, being absent, takes no part in the foregoing decision.