CUNNINGHAM, STATE AUDITOR, RESPONDENT, *v.* NORTH-WESTERN IMPROVEMENT CO., APPELLANT.

(No. 2,998.)

(Submitted September 19, 1911.   Decided November 21, 1911.)

[119 Pac. 554.]

*Master and Servant—Coal Miners—Industrial Insurance—Police Power—Legislature—Taxing Power—Constitution—Jury Trial—Equal Protection of Laws—Classification.*

Master and Servant—Industrial Insurance—Public Policy—Police Power.
   1.   *Held,* that chapter 67, Laws of 1909, providing for state accident insurance and workmen's compensation for personal injuries sustained by coal mine employees in the course of their employment, is a proper exercise of the police power of the state.
Constitutional Law—"Police Power"—Extent.
   2.   In general the "police power" extends to all the great public needs; it may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and predominant opinion to be greatly and immediately necessary to the public welfare.
Same—Equality—Classification—Class Legislation.
   3.   Chapter 67 of Laws of 1909, creating a state insurance fund for workmen engaged in coal mining, being equally applicable to all persons within the state engaged in the particularly hazardous business of mining coal, is not invalid as class legislation, as singling out a particularly hazardous employment, and subjecting it to burdens not placed on other extrahazardous employments.
Same—Classification—Power.
   4.   Classification, for the purpose of tax legislation, or of regulation under the police power, is a legislative function, with which the courts have no right to interfere, unless it is so clearly arbitrary as to invade constitutional right.
Master and Servant—Legislation—Power of Legislature.
   5.   The right of the legislature to pass laws regulating an extrahazardous business, such as coal mining, and to provide for benefits in

case of injury or death, may be properly based on the intention to reduce economic waste, to obviate breaches and dissensions between employers and employees, raise the standard of citizenship, and lower the general burden of taxes or taxation, thereby promoting peace, order, and morals.

Taxation—Taxing Power—Extent.

6.    The right of the state, in the exercise of police power, to regulate an extrahazardous business and to provide for the payment of benefits for employees injured or killed therein is supplemented by the taxing power, which is included in the police power, in order to enable the state to carry the scheme into effect.

Same—Purpose—"Public Purpose."

7.    Tax levied to raise a fund to provide industrial insurance and benefits to injured employees engaged in the extrahazardous occupation of coal mining is for a "public purpose," notwithstanding the Act operates to the direct benefit of the injured employee or his dependents, and not directly to that of the public generally.

Trial by Jury—Right.

8.    The Seventh Amendment to the United States Constitution, providing that the right to trial by jury shall remain inviolate, does not guarantee a trial by jury in a civil action in a state court.

Same.

9.    Section 23, Article III of the state Constitution, providing that the right of trial by jury shall be secured to all, and remain inviolate, applies only to cases where right of trial by jury existed at the time of the adoption of the Constitution.

Same—Limitation—Claims.

10.    Section 23, Article III, state Constitution, providing that the right of trial by jury shall remain inviolate, and referring to civil cases, did not confer the right to trial by jury, in a special proceeding to obtain the benefits of Laws of 1909, Chapter 67, providing a scheme for industrial insurance for persons engaged in coal mining within the state, and their dependents, in case of injury or death in the course of their occupation; and hence such Act was not unconstitutional, as depriving those subject to its terms of their right to trial by jury.

Constitutional Law—"Due Process of Law."

11.    The phrase "due process of law" does not necessarily mean trial or hearing by judicial proceeding.

Same—Due Process of Law—Occupation Tax—Employees' Benefit.

12.    Chapter 67 of Laws of 1909 provides a scheme of accident insurance and disability benefits for employees in coal mines, and requires the funds to be provided by a payment of one per cent of the wages of such employees, and a tax on the employer of one cent for each ton of coal mined. *Held,* that such impost was in the nature of an occupation tax; and hence the scheme provided for its collection did not operate to deprive either the miners or their employers of their property without due process of law.

Master and Servant—Injuries to Servants—Compensation Act—Police Power.

13.    Chapter 67 of Laws of 1909, providing for an indemnity to be paid to injured employees engaged in coal mining, was not invalid as a police regulation, because it provided for the payment to an injured employee of his compensation in a lump sum.

Same—Injuries to Servant—Miners' Compensation Act—Validity.

14.    Chapter 67 of Laws of 1909, providing for indemnity and benefits to injured persons engaged in coal mining, to be paid from a fund

collected from an assessment levied on both employer and employee is not unconstitutional, because it does not differentiate between a careful and a careless employer.

Same — Workmen's Compensation Act — Judicial Duties — Administrative Officers.
    15.  Miners' compensation Act (Laws of 1909, Chap. 67), providing indemnity for injured employees engaged in coal mining, from a fund to be collected from a tax levied on the workmen and the coal operators in accordance with the amount of coal mined and the amount of wages received, and providing a summary method for the disposition of claims filed under the law, is not unconstitutional, as conferring judicial power on the state auditor having charge thereof.

Same—Miners' Compensation Act—Equal Protection of Laws.
    16.  Since the miners' compensation Act (Laws of 1909, Chap. 67), providing for compensation to injured employees engaged in mining, to be furnished out of a fund collected from mine operators in proportion to the amount of coal mined and sold and the amount of wages paid, does not protect the employer who furnishes compensation under the Act from being sued for the injury and compelled to pay twice, the Act is invalid, as depriving such an employer of the equal protection of laws.

*Appeal from District Court, Lewis and Clark County; J. Miller Smith, Judge.*

ACTION by Harry R. Cunningham, as state auditor of the state of Montana, against the Northwestern Improvement Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

*Mr. Wm. Wallace, Jr.,* and *Mr. R. F. Gaines,* for Appellant, submitted a brief; *Mr. Wallace* argued the cause orally.

Is the Act in question one within the "police power" of the state? Generally speaking, the police power vested in the state may be exercised for any one of the following purposes: (a) The regulation of the sale of food products, the sale of liquors and generally of articles intended for personal consumption or use; (b) regulations for the prevention of the spread of disease or epidemics; (c) regulations looking toward the protection of the morals of a community; (d) regulations providing for the peaceful and orderly conduct of the affairs of a community; (e) regulations which tend to insure the safety and comfort of the public; and (f) regulations tending to provide for the suppression of nuisances. But the regulations must be such as "in fact are necessary for the safety and comfort of the public."

(8 Cyc., 864 *et seq.,* and cases cited.)   And the supreme court of this state, in the case of *City of Helena* v. *Kent,* 32 Mont. 279, 80 Pac. 258, 4 Ann. Cas. 235, has expressed itself upon this subject, in part saying: ''The exercise of this power must certainly have some relation to the *public* health, comfort and safety, for the rights of property, cannot be invaded under the guise of a police regulation for the protection of health, when it is manifest that such a regulation would not have that effect.''

By no possible construction can there be read into this Act provisions which bring it within any of the subjects generally recognized as being proper ones for an application of the police power.   Neither the authorities generally, as evidenced by the reference to 8 Cyc., *supra,* nor this court, give countenance to the contention that this Act is a police regulation because it looks toward the public comfort by making provision for the care of persons, otherwise subject to become burdens upon the community, because of a pauperized condition.   Counsel claim that the purpose of the Act was to provide for indigent persons, otherwise liable to be dependent upon the state at large.   But there is patent fallacy in the argument that it thus conserves the public comfort.   By the provisions of this Act, the benefits conferred by it are not paid into a state fund for the maintenance and support of the indigent persons whose condition was brought into existence by the death or permanent injury of a supporting relative working in a coal mine or coal washery, but are paid directly to certain private individuals. The money after payment is subject to their absolute control, and no assurance whatever is given the state or the community that within one day, one week, one month, one year, or any time whatsoever after the payment of the benefits these persons will not become public charges, and as much a burden upon the community as if the Act had never been passed.   And yet another objection, and a fatal one, to the soundness of such an argument, is the fact that the Act is not broad enough to cover the ''public'' as such.   It applies to but a portion of a possibly

indigent public; no such provision is made or attempted to be made for the care of persons otherwise rendered indigent. Persons pauperized by death or permanent injury of supporting relatives engaged in quartz mining, railroading, electrical or other occupations regarded as extrahazardous or even nonhazardous, are not provided for in any similar manner. The public, for whose benefit and protection statutes designated "police power statutes" are enacted and authorized, does not mean some one portion of the citizens of a community, but all of them affected by any given condition. "The term 'public' is applied strictly to that which concerns *all* the citizens and *every part of the state.*" (*Fisk* v. *Cuthbert,* 2 Mont. 593. See, also, *Knight* v. *Thomas,* 93 Me. 494, 45 Atl. 499; *Jones* v. *City,* 63 Kan. 243, 65 Pac. 244.)

One of the chief reasons advanced in the lower court why the constitutionality of this Act should be upheld was because it would provide for the care of indigent persons. The care of the poor of a community is a public duty devolving upon the government, and revenue is regularly raised for that purpose. If the sole claim of this Act to be regarded as constitutional is the reason just referred to, the provisions of section 32, Article V of the Constitution of Montana dispose of the question, as this Act originated in the Senate and its purpose would be the raising of revenue. "The true meaning of 'revenue laws' in these acts is such laws as are made for the direct and avowed purpose of creating and securing revenue or public funds for the service of the government." (See *State* v. *Bernheim,* 19 Mont. 516, 49 Pac. 441, quoting approvingly the language of Mr. Justice Story in *United States* v. *Mayo,* 1 Gall. 396, Fed. Cas. No. 15,755.)

Is the Act an example of class legislation? We claim it is and cite the following instances apparent upon a reading of the Act which we think make clear the correctness of this statement: (a) The Act singles out one particular extrahazardous employment and subjects it to burdens not placed upon other extrahazardous employments within the state; (b) it similarly singles

out the employees of such an industry and similarly imposes upon them burdens never before imposed and not now imposed upon other employees engaged in other employments, likewise recognized as extrahazardous; (c) as within a class (assuming, but not conceding, that the legislature can constitutionally create this class), there is a distinction, by burden without uniform benefit, imposed upon the employee members thereof, by compelling foreigners to submit to wage deductions similarly as do citizens of this country and at the same time denying to the dependent parents or other dependent relatives of such foreigners (other than wife or dependent children), when not living in this country, any benefits under this Act—while no similar limitation is made with regard to native citizens; (d) as between the operator and the employee within this assumed class the operator is discriminated against because opportunity is afforded the injured employee of claiming benefit under the Act (regardless of whether there would be a legal liability) or of waiving the benefits of this Act and proceeding, in cases of clear liability, at the common law—while no option is given the employer to defend against claims which he regards, and which may in fact be, cases of absolute nonliability. In substance the Act says to the employee you may either take the benefits offered you, or sue, while it says to the operator, you take whatever benefits there may be to you under the Act, and there your rights cease; (e) and the burden imposed is not uniform upon the various persons subject to the provisions of the Act, as the property of one person is thereby taken to pay the debts of another.

Unless every person in a particular class has the same obligations imposed upon him by a police regulation the constitutionality of the Act cannot be upheld. "The amendment contemplates classes of persons and the protection given by the law is to be deemed equal, if all persons in the same class are treated alike under like circumstances, both as to privileges incurred and liabilities imposed." (Cooley's Principles of Constitutional Law, 237; *Barbier* v. *Connolly,* 113 U. S. 27, 5 Sup. Ct. 357, 28

L. Ed. 923; *State* v. *Holland,* 37 Mont. 406, 96 Pac. 719; *State* v. *Cudahy Co.,* 33 Mont. 179, 114 Am. St. Rep. 804, 82 Pac. 833, 8 Ann. Cas. 717; *Wadsworth* v. *Railway,* 18 Colo. 600, 36 Am. St. Rep. 309, 23 L. R. A. 812, 33 Pac. 515.)

The Act violates both the provisions of section 27, Article III of the Constitution of Montana, and the provisions of the Fourteenth Amendment to the Constitution of the United States.

Assuming for the purposes of argument alone, that this Act could be upheld as a police regulation, and was not class legislation of that character, it is apparent from the procedure provided for the determination of rights to benefits and for the settlement of disputes under the Act, that the provisions of section 23, Article III of the Constitution of the state of Montana, and of the Seventh Amendment to the Constitution of the United States have been totally disregarded. Every operator is denied his inalienable right to have a jury of his peers determine, first, whether there is a liability for, or a right to, compensation because of the particular injury or death, and second, the amount of money which will fairly compensate the injured person or his dependent relatives. The decisions upon this question are all agreed in support of the proposition that attempted legislative denial of this constitutional right at once renders nugatory any statute or Act by which such end is sought to be attained. (See *Graves* v. *Northern Pac. Ry. Co.,* 5 Mont. 556; *Wadsworth* v. *Railway, supra; Dacres* v. *Navigation Co.,* 1 Wash. 525, 20 Pac. 601; *Ives* v. *Southern Buffalo Ry.,* 201 N. Y. 271, 94 N. E. 431, in which latter case this question was raised at the time of the consideration of the constitutionality of the New York Compensation Act of June 25, 1910.)

The state auditor is made sole arbiter of all questions involved or which may arise under the provisions of the Act. He alone determines whether a man was killed or injured "during the course of his employment," or in the performance of his duties. These questions are questions which are material in determining liability, and sometimes are questions of law, sometimes questions of fact, and sometimes mixed questions of law and fact. He alone determines the extent of the compensation

to be paid or received in the case of injury.  This is also a question which is always one of fact, and often a serious question of fact.  Courts of justice, composed of judges and juries, were created by our Constitution for the purpose of deciding just such questions as these, and the Constitution of this state guarantees to the citizens thereof that they shall at all times have the right to be heard by such courts and juries before their property is taken from them.  Police statutes there are without end, but in no instance of a constitutional statute of that character is the person subjected to their provisions denied the right to his day in court before the penalties imposed by the legislation shall finally attach.

We insist that this Act denies the right to trial by jury, and for this reason also is unconstitutional and void.

Is property taken without due process of law?  An examination of the Act in detail will show that all that is necessary to be established in order to receive benefits under it is that the injury or death occurred during the course of the employment, and by causes arising therein.  Whether the cause of the injury or death was one which could not have been avoided by the exercise of even the highest degree of care or caution on the part of the master (to say nothing of the exercise of ordinary care); whether it was one necessarily incident to the conduct of the business; whether it was one which was due to the fault of the injured person, either solely or contributing thereto; or whether it was one which was due to his willful misconduct— none of these considerations affect the question of liability in the slightest.  No right to be heard on any of these questions is given; the money of the operator and the employee is first arbitrarily taken and then it is as arbitrarily given away.  Property is taken without due process of law.  In the case of *State* v. *District Court*, 33 Mont. 532, 85 Pac. 367, it is said: "Due process of law includes a notice and hearing before judgment." (*Hovey* v. *Elliott*, 167 U. S. 409, 17 Sup. Ct. 841, 42 L. Ed. 215; *Bielenberg* v. *Montana U. Ry. Co.*, 8 Mont. 271, 20 Pac. 314, 2 L. R. A. 813.)  Moreover, the property of the operator is taken

to pay damages, not alone for injuries which his employees may suffer, but for injuries which the employees of some other operator sustain. The operator of one coal mine or washery may be extraordinarily cautious and careful for the safety of his employees, and the employees of that mine may themselves be the most careful and prudent of miners, and they may run along for a period of years without any accident which would entitle them to benefits under the Act, while their neighbors might be slack in the management of their mine, the employees therein might be reckless and injury of serious nature might be constantly attendant upon the operations therein. Daily, monthly and yearly the earnings of the careful operator and the savings of the prudent employee are taken to compensate others for their own shortcomings. No matter how unfairly the law could operate, there is no chance to escape its penalties. Your property is taken from you, whether or no; and you know not whence it goes, nor why.

There is not a feature of the New York Act of June 25, 1910, which does not in elemental principles of basic fairness surpass the Montana Act; and yet, for unanswerable constitutional reasons, the Act was held invalid. Viewed from any angle but one conclusion can be reached, *viz.*, that regardless of fault, private property is taken without due process of law and the provisions of the state and federal constitutions have been waived aside in a worthy but ill-conceived attempt to remedy unfortunate social conditions.

For Respondent, there was a brief by *Mr. Albert J. Galen,* Attorney General, and *Mr. J. A. Poore,* Assistant Attorney General; *Mr. Poore* argued the cause orally.

It is conceded by respondent that if this Act is upheld, it must be justified under the police power, and we contend that it is a valid exercise of that power. "What the police power is, and what its extent and limitations are, can only be ascertained by the gradual process of judicial inclusion and exclusion as the cases presented for decision require." (Russell on

Police Powers of the State, 25, 26.) Freund on Police Power (sec. 3, p. 3), in an attempt to define the term, uses the following language: "From the mass of decisions in which the nature of the police power has been discussed, and its application either conceded or denied, it is possible to evolve at least two main attributes or characteristics which differentiate the police power; it aims directly to secure and promote the public welfare, and it does so by restraint and compulsion. * * * It is not by general statements, but only by a detailed examination of statutes and decisions that the power can be fully understood and defined. * * * It will reveal the police power not as a fixed quantity, but as the expression of social, economic and political conditions. As long as these conditions vary the police power must continue to be elastic." If this statement be a correct definition of the police power, it will readily be seen that no definite boundary can be fixed beyond which the power cannot extend,—its limits must be governed and determined by the facts of each particular case as it arises. It is true that in the vast majority of instances its purpose has been to subserve the health, morals, peace and order, or safety of the public, but it cannot be said that it is limited to these purposes alone, or that it must affect all of the people of a particular community. Under the police power of the state, minors may be prohibited from frequenting saloons; liquor dealers may have certain limitations placed upon them; the eight-hour law is made applicable to certain classes of employment; the sixteen-hour law to a different class of employment,—in all such instances the statute affects a certain class of individuals and not the entire community. So the statute here in question affects only the operators and employees of coal mines and coal washers in the state. Railroad companies may be made liable for losses by fire communicated to property by sparks escaping from locomotives, notwithstanding the fact that they have used every possible precaution. (*St. Louis etc. Ry. Co.* v. *Mathews,* 165 U. S. 1, 17 Sup. Ct. 243, 41 L. Ed. 611, and numerous cases cited.) The statute in that case was in effect one indemnifying the owners

of property along the line of railroad against loss by fire caused by the operation of the road; the railway company was made an insurer of property along its line. In the case at bar the operator and employees of coal mines and coal washers are made insurers of the employees against accidents happening in the course of their employment. This absolute liability on the part of the railroads was recognized as early as 1840 in Massachusetts (*Lyman* v. *Boston,* 4 Cush. 288), and has been upheld by numerous decisions since that time. (See *Grissell* v. *Housatonic R. R. Co.,* 54 Conn. 447, 1 Am. St. Rep. 138, 9 Atl. 137; *Baltimore & Ohio Ry. Co.* v. *Kreager,* 61 Ohio St. 312, 56 N. E. 203; *Union Pac. Ry. Co.* v. *De Busk,* 12 Colo. 294, 13 Am. St. Rep. 221, 20 Pac. 752, 3 L. R. A. 350; *Jensen* v. *South Dakota Ry. Co.,* 25 S. D. 506, 127 N. W. 650, and cases cited.) The supreme court of Nebraska, in the case of *Union Railway Co.* v. *Porter,* 38 Neb. 226, 56 N. W. 808, upheld as constitutional the following statute: "Every railroad company shall be liable for all damages inflicted upon the person of passengers while being transported over its road, except in cases where the injury done arises from the criminal negligence of the person injured, or where the injury complained of shall be the violation of some express rule or regulation of said road actually brought to his or her notice." The same statute was upheld in the following cases: *Chicago R. R. Co.* v. *Young,* 58 Neb. 678, 79 N. W. 556; *Chicago R. R. Co.* v. *Zernecke,* 59 Neb. 689, 82 N. W. 26, 55 L. R. A. 610, 183 U. S. 582; 22 Sup. Ct. 229, 46 L. Ed. 339; *Clark* v. *Russell,* 97 Fed. 900, 38 C. C. A. 541. In the case of *Bertholf* v. *O'Reilly,* 74 N. Y. 509, 30 Am. Rep. 323, the supreme court of New York declared a statute to be a valid exercise of the police power which created a cause of action for damages in favor of a person injured in person or property by the act of an intoxicated person, against the owner of property, whose only connection with the injury was that he leased the premises where the liquor causing the intoxication was sold or given away. This case further illustrates the fact that negligence is not necessary to impute liability and that the police power is some-

times extended by the courts to extreme limits. In the case of *McGlone* v. *Womack,* 129 Ky. 274, 111 S. W. 688, 17 L. R. A., n. s., 855, a statute imposing a license tax on dogs, which tax was required to be paid to the state treasurer and kept in a special fund for the purpose of indemnifying losses by the killing or injuring of sheep by dogs, was held to be a valid exercise of the police power. (See, also, *Longyear* v. *Buck,* 83 Mich. 236, 47 N. W. 234, 10 L. R. A. 43; *Van Horn* v. *People,* 46 Mich. 183, 41 Am. Rep. 159, 9 N. W. 246; *Holst* v. *Roe,* 39 Ohio. St. 340, 48 Am. Rep. 459.) The Guaranty Bank Act of Oklahoma created a state banking board, and authorized and directed the board to levy upon every bank existing under the laws of the state an assessment of one per cent of the bank's average daily deposits for the purpose of creating a depositors' guaranty fund, the purpose of which fund was to secure the full repayment of deposits. It was contended in the case of *Noble State Bank* v. *Haskell,* 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A., n. s., 1062, that the statute operated to deprive the bank of its property without due process of law, but the Act was justified by the court under the police power. There is but slight difference between a statute which compels banks to contribute to a general fund to insure the payment of the depositors of a competing bank, which may or may not be conducted with the same degree of business skill as another which is required to bear a portion of the general burden of insurance, and the statute here under discussion, which compels operators and employees of coal mines and washers in this state to contribute to a fund to insure the employees against injury. The two are so nearly alike that it is difficult for us to distinguish between the legal principles involved.

A statute of New York, making railway companies liable for all damages to cattle or other animals along their road, until the road is fenced as required by the Act, regardless of negligence, was upheld in the case of *Corwin* v. *N. Y. & Erie R. R. Co.,* 13 N. Y. 42.

A statute of Utah making a person who drives cattle over a public highway, where the highway is constructed on a hillside,

liable for all damages done by such animals to the highway, was declared constitutional. (*Jones* v. *Brim,* 165 U. S. 180, 17 Sup. Ct. 282, 41 L. Ed. 677.) The above cases but illustrate the fact that private property may be taken under the police power of the state, without regard to the amount of care and diligence exercised by the individual or corporation from whom it is taken, and used for a purpose which benefits a general community or particular class of a community, without violating the Constitution of the United States, and though the reasons for doing so often seem far-fetched, courts have followed and still continue to follow and broaden them. We can see no distinction in principle between the cases hereinbefore cited and the case at bar, so far as the police power of the state is concerned.

The objection that the Act is one for the purpose of raising revenue and should therefore have originated in the House instead of the Senate is without merit. The true meaning of "revenue laws" is such laws as are for the direct and avowed purpose of creating and securing revenue or public funds for the service of the government. The purpose of the Act in question is to raise a fund for indemnifying certain individuals and their dependents in case of accident resulting in injury or death. (*State* v. *Bernheim,* 19 Mont. 512, 49 Pac. 441; *Longyear* v. *Buck,* 83 Mich. 236, 47 N. W. 234, 10 L. R. A. 43; *Van Horn* v. *People,* 46 Mich. 183, 41 Am. Rep. 159, 9 N. W. 246; *McGlone* v. *Womack,* 129 Ky. 274, 111 S. W. 688, 17 L. R. A., n. s., 855; *Evers* v. *Hudson,* 36 Mont. 135, 92 Pac. 452.)

Is the Act an example of class legislation? The legislature may distinguish, select and classify objects of legislation, and necessarily must have a wide range of discretion. And this because of the function of legislation and the purposes to which it is addressed, classification for such purposes is not invalid because not depending on scientific or marked differences in things, or persons, or any other relations. It suffices that it is practical, and is not reviewable unless palpably arbitrary. (*Orient Ins. Co.* v. *Daggs,* 172 U. S. 557, 19 Sup. Ct. 281, 43 L. Ed.

·552; *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 287, 18 Sup. Ct. 594, 42 L. Ed. 1037; *Railway Co.* v. *Mackey,* 127 U. S. 204, 8 Sup. Ct. 1161, 32 L. Ed. 107.) In this instance, the legislature saw fit to apply the Act only to that particular extrahazardous employment of coal mining, and not to quartz mining, railroading or other hazardous employments, and we contend that it did not violate any constitutional provision in so doing, as the Act applies alike to all in that particular business. (See *Soon Hing* v. *Crowley,* 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145.)

The Act provides: "The representatives of the foreigner, except the widow or dependent children, who were not living within the country at the time of the accident, shall have no claim for compensation provided for in this act." It will be seen that the foreigner himself receives identically the same benefits as any other employee who is a citizen of this country. However, if he should be killed, his dependent relatives not living within the country at the time of the accident (except his widow or children) would not be entitled to compensation. This is not an instance of class legislation, for the following reason: Each employee, individually, receives the same benefits, under like circumstances and conditions, as every other employee. It is within the power of the legislature to discriminate against nonresident aliens. The state has no concern to protect their interests, any more than it has power to control their rights; and it is not the policy of the law to place burdens upon our own citizens for the benefit of nonresident aliens.

The purpose of the law is to protect and prevent the pauperizing of individuals in this country by reason of accident or death to an employee, and not to foster dependents in foreign countries who are not citizens of this state, although the widow and dependent children of foreigners, residing abroad, are included within the benefits provided for by the Act.

The objection that the property of one person is taken to pay the debts of another is conclusively answered by the supreme court in the case of *Noble State Bank* v. *Haskell, supra.*

44 Mont.—13

The very basic principle of the bank guaranty law is the taking of property of one to pay the debts of another, and this may be done, under the police power of the state.

Is the right to trial by jury denied? It is objected that every operator is denied his inalienable right to have a jury determine (1) whether there is a liability for or a right to compensation because of the particular injury or death, and (2) the amount of money which will fairly compensate the injured person or his dependent relatives. In answer to objection (1) we will say: Section 7 of the Act provides that if persons paying into the insurance fund believe that anyone is obtaining or has made application to obtain benefits improperly or fraudulently, they may file a written request that such claim be investigated. If an employee claims to be entitled to benefits under the Act, and it is denied him, there is nothing in the Act to prohibit or prevent him seeking redress against the trustee of the insurance fund in a court of law, by *mandamus* or other appropriate remedy; and if an employee is obtaining benefits which a contributor to the fund believes he is not entitled to, there is nothing in the Act to prevent such person so contributing from resorting to a court of law to prevent it. And if the Act does contain any such clause, that clause alone and not the entire Act would be void. (Cooley's Constitutional Limitations, 246; *Northwestern M. Life Ins. Co.* v. *Lewis & Clark Co.*, 28 Mont. 484, 98 Am. St. Rep. 572, 72 Pac. 982.) In answer to objection (2), the statute fixes the amount which shall be paid to the injured employee or his dependents, and if the Act is a valid police regulation, a jury could not fix the amount at a greater or less amount. The entire question is whether or not the Act is a reasonable police regulation. The Seventh Amendment to the Constitution of the United States does not guarantee a trial by jury in a civil action in a state court, and so far as this amendment is concerned, the states are left to regulate trials in their own courts in their own way. (*Walker* v. *Sauvinet*, 92 U. S. 92, 23 L. Ed. 679.) Of course, under section 23 of Article III of our state Constitution, trial by jury in a civil suit in the state courts is guaranteed, but it is our contention that the

Act in question does not deny it. It provides a manner of administering the trust insurance fund, but this does not and cannot preclude a person from resorting to the courts to determine whether or not he is subject to the provisions of the Act.

Is property taken without due process of law? It is conceded that under the provisions of this Act, an employee is entitled to the benefits of the Act, even though his own negligence was the cause of the injury; in other words, he is entitled to its benefits if he is accidentally injured during employment, and by causes arising therein. If, however, he is injured through gross negligence on his own part, a remedy is provided for investigation by the state auditor and secretary of the state board of health (sec. 7 of Act); and if these persons should refuse to act, or act fraudulently, or abuse their discretion, we see no reason why resort could not be had to the courts.

If under the police power of the state the employer and employee can be compelled to contribute to the fund, it is not taking property without due process of law to administer this fund without first resorting to the courts in each instance. The whole argument of counsel for appellant, in so far as his objection that the Act takes away property without due process of law is concerned, applies only to the question of negligence. It has been seen that statutes have been upheld, under the police power, making railway companies liable for loss by fire regardless of negligence. (*St. Louis Ry. Co.* v. *Mathews, supra; Jensen* v. *South Dakota Ry. Co., supra.*) And also for damages inflicted upon passengers while being transported over its road, regardless of negligence. (*Union Pac. Ry. Co.* v. *Porter, supra; Clark* v. *Russell, supra.*) It is settled that under the police power, an absolute liability may be imposed regardless of negligence.

It is further objected that the property of one operator is taken to pay damages, not alone for injuries which his employees may suffer, but for injuries which the employees of some other operator sustain. This objection is fully answered in the decision on the Bank Guaranty Act, *Noble State Bank* v. *Haskell, supra.*

It is a well-settled principle of law that statutes are always presumed to be constitutional, and this presumption will be indulged in by the court until the contrary is clearly shown. (8 Cyc., p. 801, and cases cited; Cooley on Constitutional Limitations, 255; *Michigan Cent. R. Co.* v. *Michigan R. R. Co.,* 160 Mich. 355, 125 N. W. 549.) A statute should not be declared unconstitutional unless it clearly runs counter to the letter or spirit of some provision of state or federal constitutions, and when it is reasonably susceptible of two conclusions, one of which will render the Act void and the other valid, it must be construed so as to render it valid. (*State* v. *Frear,* 142 Wis. 320, 125 N. W. 961; *In re Southern Wisconsin Power Co.,* 140 Wis. 245, 122 N. W. 801.) The burden of showing that the statute in question is repugnant to constitutional provisions is upon the appellant, and it must show that there is no basis upon which the district court could rest its conclusion that the legislation in question was a proper exercise of the police power. (*Holden* v. *Hardy,* 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780.)

MR. JUSTICE SMITH delivered the opinion of the court.

The Eleventh Legislative Assembly passed ''an Act to create a State Accident Insurance and Total Permanent Disability Fund, for coal miners and employees at coal washers in the state of Montana, and providing for the maintenance and management of the same; extending and defining the duties of the state auditor, and fixing penalties for the violation of the provisions of this Act.'' (See Chapter 67, p. 81, Laws of 1909.) In order to understand the Act in detail, it seems advisable to quote it in full. It reads as follows:

''Section 1. All workmen, laborers and employees employed in and around any coal mines, or in and around any coal washers in which coal is treated, except office employees, superintendents and general managers, shall be insured in accordance with the provisions of this Act, against accidents occurring in the course of their occupations.

''Sec. 2. All corporations, partnerships, associations or persons engaged in the business of operating any coal mine or coal

washers in the state of Montana shall pay to the auditor of the state, within five days after the monthly wages at the particular mine shall have been paid, one cent per ton on the tonnage of coal mined and shipped, or sold locally, or having been mined is ready for shipment or sale during the month for which the wages were- paid; and all persons mentioned in section 1 employed in and about coal mines shall allow to be deducted from their gross monthly earnings one per cent thereof, the deduction to be made by the agent, manager, or foreman of any corporation, association, partnership, person or persons engaged in the business of operating any coal mine or coal washer, and paid to the state auditor within five days after such monthly wages have been paid.

"Sec. 3.   The agent, manager, foreman or accountant of any corporation, partnership, association, person or persons engaged in mining coal in Montana, shall on or before the fifth day succeeding the payday at his respective mine, make report under oath to the state auditor as to the tonnage mined and subject to the payment of one per cent per ton thereon; and stating the gross earnings subject to the one per cent deduction as provided in this Act, accompanied by a certified check in full for the amount of the tax provided in section 2 of this Act. It shall be unlawful for any person, employer, employee, corporation, partnership, association or union to make any contract waiving, avoiding or affecting the full legal effect of this Act.

"Sec. 4.   It is hereby made the duty of the state auditor to receive all moneys as provided for in this Act, and to send the proper acknowledgment to the person making such remittance. The auditor shall pay all moneys so received by him to the state treasurer, who shall keep such sums in safe custody in a distinct fund to be known as the Employers and Employees' Cooperative Insurance and Total Permanent Disability Fund.   The state treasurer must invest the surplus of this fund in safe and convertible state, county or city bonds, or bonds of the United States.   All interest accruing from such investments shall be accredited to this insurance fund.   The bond of the state treasurer shall be liable for such funds, and it shall be his duty **to**

keep accurate accounts of the receipts and disbursements of such money.

"Sec. 5. The auditor of state shall keep full statistics of the operation of this function of his department in the event of death by accident of an employee insured under this Act, who shall have come to his death in the course of his employment and by causes arising therein. The auditor of state upon being satisfied by adequate evidence of such death shall issue a warrant upon the state treasurer to persons dependent upon the deceased, these warrants to issue in the following order: (1) To surviving wife and child, or children, in equal shares, and if neither wife or child, or children be alive, then (2) to surviving parents who are dependent, or partially so, upon the deceased; if none, then (3) to such other relative of the deceased as survive him and are dependent upon him, in the sum of three thousand ($3,000.00) dollars.

"A workman receiving injuries which permanently incapacitate him from the performance of work shall receive a compensation monthly, not to exceed one dollar ($1.00) a day for each working day. Compensation for permanent injury shall not be allowed until after the expiration of twelve weeks from the time such injuries were sustained, provided that the medical practitioner examines and pronounces the injury as being permanent, compensation may then be allowed from commencement of disability. The auditor of state, however, may, when in his judgment he deems it advisable, use so much of the funds as is necessary in the procuring of a medical practitioner, for the purpose of examination or treatment under this Act, for such injuries as herein mentioned compensation shall continue during disability, or until settlement if effected as provided for in section 9 of this Act. Total or permanent disability shall consist of the loss of both legs or both arms, the total loss of eyesight or paralysis, or other conditions incapacitating him from work, caused by accident, or injuries received during employment as specified by this Act; provided, that if death, as a result of the injury, ensues at a period not longer than one year from date of accident the sum of three thousand dollars

($3,000.00) shall be paid the deceased workman's dependents as hereinbefore provided.  The representatives of a foreigner, except the widow or dependent children, who were not living within the country at the time of the accident, shall have no claim for the compensation provided for in this Act.  Such foreign person shall file their foreign address, if married, with the office of their employer with whom they are employed and duplicate thereof with the state auditor, giving their wife's name and dependent children, and such other identification as may be required by the auditor of state.  Loss of any limb or eye, caused by accident to a workman while employed as provided for in this Act, shall be compensated for in the sum of one thousand ($1,000.00) dollars, provided, that in the event there shall be no funds available in the fund to pay the auditor's warrant when drawn the same shall draw interest out of the fund at the rate of ten per cent per annum until such warrant is called for payment by the treasurer which shall be as soon as the fund is sufficient to pay the same with its interest when due.

"Sec. 6.   Where a workman is entitled to monthly payments under this Act, he shall file with the auditor of state his application for such, together with a certificate from the county physician of the county wherein he resides, attested before a notary public.

"Sec. 7.   If any person or persons, company or corporation who is then paying into this insurance fund shall believe that any person or persons are obtaining, or having made application to obtain benefits thereunder improperly or fraudulently, and shall file his written request that such person's claim be investigated, the state auditor must, upon the receipt of such request request the secretary of the state board of health to make an examination for the purpose of this Act and his certificate as to the condition of the person or persons with reference to their rights to benefit under this Act shall be conclusive evidence as to his condition.

"Sec. 8.   If the workman refuses to submit himself to such examination, or in any way obstructs the same, his right to

compensation under this Act shall be suspended until such examination takes place, and shall absolutely cease unless he submits himself for an examination within one month after being required to do so.

"Sec. 9.    When any monthly payment has been made to a workman for any period whatever, the liability under this Act may, on the application by, or on behalf of the workman, be redeemed by the payment of a lump sum, which in no instance shall be in excess of the amount specified as death indemnity and all monthly payments made prior shall be deducted from such settlement.

"Sec. 10.    The auditor of state shall report in January of each year to the governor of the experience and business of this function of his department, and shall have plenary power to determine all disputed cases which may arise in its administration not herein provided for, and to recommend in his report the rates or premium necessary in order to preserve such fund, and shall order paid such indemnification as herein provided. He shall have power to define the insurance provisions of this Act by regulations not inconsistent therewith and shall prescribe the character of the monthly or other reports required of the parties liable hereunder and the character of the proofs of deaths, or to total permanent disability, and shall have power to make all other orders and rules necessary to carry out the true intent of this Act.

"Sec. 11.    No money paid or payable in respect of insurance or monthly compensation under this Act shall be capable of being assigned, charged, taken into execution, or attached, nor shall the same pass to any other person by operation of law; and the acceptance of pecuniary benefit under the provisions of this Act shall operate to release the person or persons, corporation, partnerships, or associations causing such injuries or death for which benefits are so claimed, who shall have paid the assessment provided in section 2 of this Act, and also the employer, officers and agents thereof from all liability and claim arising from such injuries or death.    The commencement of a

suit to recover for such injuries or death shall operate as a forfeiture of the right to benefit under this Act.

"Sec. 12.   A manager, agent, foreman, accountant, person or persons who represent any corporation, partnership, association, person or persons, engaged in the mining or management of any coal mines or coal washers in Montana, or person or persons liable for the payment herein provided for, who shall violate the intent of this Act by inaccurate reports of tonnage of coal produced by them, or the earnings of employees in their employ, or who in any manner hinders or obstructs the auditor of state in ascertaining facts bearing upon any case provided for in this Act or who may refuse correctly to make out such reports as are required by this Act, or as requested by the auditor of state, or submit to its provisions, when liable therefor, or who shall fraudulently obtain benefits hereunder shall be fined for each offense the sum of not less than one hundred ($100.00) dollars nor more than five hundred ($500.00) dollars and imprisonment in the county jail for a period of not less than one month nor more than six months, or by both such fine and imprisonment.

"The proceeds of all fines shall be forwarded to the state treasurer and by him credited to the insurance fund.

"Sec. 13.   This Act to be in full force and effect from and after the first day of October, nineteen hundred and ten, benefits to commence four months thereafter."

On January 25, 1911, an agreed statement of fact was filed in the district court for Lewis and Clark county, as follows:

"Come now the plaintiff and defendant in the above-entitled action, and present and submit to the above-entitled court the following agreed case, containing the facts upon which this controversy depends, as follows, to wit:

"1. That plaintiff is now, and at all times herein mentioned has been, the duly elected, qualified, and acting state auditor of the state of Montana.

"2. That defendant is, and was at all times herein mentioned, a corporation organized and existing under and by virtue of the laws of the state of New Jersey, and is, and was at all times

herein mentioned, and particularly during the month of October, 1910, engaged in the business of operating coal mines and coal washers at or near Red Lodge, in the state of Montana.

"3. That on the 20th day of November, 1910, the monthly wages for the month of October, 1910, of all workmen, laborers, and employees of defendant were paid by defendant.

"4. That during the month of October, 1910, defendant mined from its mines at or near Red Lodge, Montana, and either shipped or sold locally fifty-nine thousand six hundred and fifty-one (59,651) tons of coal.

"5. That the gross monthly earnings of all workmen, laborers and employees employed in and around the coal mines of the defendant, and in and around its coal washers in which coal is treated, except its office employees, superintendents, and general managers, for the month of October, 1910, was the sum of $79,000.47.

"6. That under the provisions of Chapter 67 of the Eleventh Session Laws of the state of Montana entitled 'An Act to create a State Accident Insurance and Total Permanent Disability Fund, for coal miners and employees at coal washers in the state of Montana, and providing for the maintenance and management of the same; extending and defining the duties of the state auditor; and fixing penalties for the violation of the provisions of this Act'—plaintiff demanded of the defendant one cent per ton on the tonnage of coal mined and either shipped or sold locally by defendant during the month of October, 1910, to wit, the sum of $596.51, and demanded of the defendant one (1%) per cent of the gross monthly earnings of all workmen, laborers, and employees employed in and around the coal mines of the defendant, and in and around its coal washers in which coal is treated, except its office employees, superintendent, and general managers, for the month of October, 1910, amounting to $790, making a total of $1,386.51; and that defendant has failed and refused to pay said amount, or any part thereof.

"7. That some of the employees of the defendant have protested against the deduction by said defendant of one (1%)

per cent, or any other amount, from their gross monthly earnings, as provided by said Chapter 67; and some of the employees of the defendant have consented to the deduction of one (1%) per cent from their gross monthly earnings, under the provisions of said Chapter 67.

"8. That if plaintiff is entitled to recover upon this case he will be entitled to interest on the amount of recovery from the 25th day of November, 1910.

"This controversy is submitted upon the foregoing agreed case, under the provisions of sections 7254, 7255, and 7256, Revised Codes of the state of Montana, for the purpose of determining the constitutionality of Chapter 67 of the Eleventh Session Laws of the state of Montana, under the agreed state of facts here presented."

The district court adjudged that the plaintiff, as auditor, have and recover of the defendant the sum of $1,386.51, with interest thereon from the 25th day of November, 1910, together with costs. From that judgment the defendant has appealed.

On the part of the appellant it is contended:

(1) The Act does not amount to an exercise of the police power, so called, because not preventive in its nature, and because it does not serve any of the necessary ends of police legislation.

(2) If the subject were one which could be handled under the police power, so called, the Act is class legislation.

(3) The Act operates to deprive those subject to its terms of their right to trial by jury, guaranteed to them by the federal and state constitutions.

(4) The Act operates to take property without due process of law, and violates the provisions of the federal Constitution, as well as Article III, section 27, of the Constitution of the state of Montana.

(5) In reserving to the employee his right to an action at law, the Act denies to the mine operator the equal protection of the laws.

(6) The provision for payment to an injured employee of his compensation in a lump sum defeats the purpose of the Act itself, viewed as a police regulation.

(7) The Act does not differentiate between a careful and careless employer.

(8) The Act lodges judicial power in the state auditor.

We shall not endeavor to consider the points raised in the foregoing order, because it will be noted that many of them comprehend, incidentally, questions of law involved in others.

At the outset, it may be stated that the Act, viewed as a whole, presents certain fundamental propositions, novel in this jurisdiction, which, although they have lately been the subject of serious consideration by courts and students of present-day conditions, involving, as they do, grave questions of constitutional law, as well as of economics, are yet so comparatively new in conception that their supposed basic principles have not been recognized as sound by some tribunals and law-writers, and may be said not to have been accepted in their entirety by any court. It will not suffice to say that because the theory or design of the law-making power, as evidenced by the Act, is one which is not only new in principle, but revolutionary of certain preconceived and deeply rooted notions of lawyers, therefore the Act is unconstitutional. Nevertheless, it is the duty of courts to jealously guard the constitutional rights of the citizen.

It is matter of common knowledge, among lawyers and laymen alike, that our present system of compensation for injury or death of an employee, caused by the actual or imputed negligence of his employer, has given rise to conditions which seem to demand an abrogation of that system. This demand is so widespread and insistent that we shall do well to inquire into the reasons therefor.

In this state the affirmative defenses of contributory negligence and assumption of risk, including in the latter the negligence of a fellow-servant, are still generally available to the employer. The result is that in many cases the maimed employee, and, in case of his death, his dependents, are obliged to bear the whole burden of misfortune. He or they may suffer the humiliation of becoming public charges, with the consequent additional expense to the taxpayer. The injury or death may have been the result of inevitable accident in the course of the

employment, in which event the workman is the sole victim. Whatever may be the reason therefor, actions for damages for personal injury and death have increased enormously in number in the past few years. It is notorious that but a small proportion of the moneys forced from the employer in these cases finds its way into the pockets of the plaintiff. The remainder is frittered away in payment of counsel fees, witness fees, court costs, and other necessary expenses of litigation. The records of this court disclose that our best and most high-minded lawyers have, as was their duty, advocated the cause of the plaintiff in many of these cases; nevertheless, the fact remains that the solicitor of personal injury cases is a hateful reality, and much unnecessary and ill-advised litigation results from his activities. These cases are prolific of perjury and subornation of false swearing. They also add a great weight to the burden of the taxpayer. Some plaintiffs have lost meritorious causes, and many defendants, especially public service corporations, have been mulcted in heavy damages in actions where the great preponderance of the evidence was in their favor. Jurors in some communities are, unconsciously perhaps, prejudiced against corporations, as such. In practical application, our present system does not afford the equal protection of the laws to certain defendants. It is impossible not to recognize the fact that the defendant's ability to pay is often used as a basis for calculating the compensation due the plaintiff. Personal injury cases breed class hatred, as between capital and labor, in its most virulent form.

1. Can this statute be upheld as a proper exercise of the police [1] power of the state? We shall first concern ourselves with the police power generally, as applied to the Act. It is contended on the part of the appellant that the measure is not designed to prevent the evils growing out of and incident to the present system of actions for fault, because it does not abolish such actions. We shall discuss this question later, but here it may be suggested that if the Act has a reasonable tendency to accomplish the desired result it ought to be upheld, so far as that point is concerned.

We think it cannot be doubted that many employees and dependents of employees who actually have good causes of action under the common-law and statutory procedure now in force, will voluntarily resort to the provisions of the Act to save the expense and delay necessarily incident to litigation in the courts. Be that as it may, the members of the legislature by whom the Act was passed were evidently of opinion that such a result would or might ensue, and, as the question was one essentially for their determination, the courts ought not to declare otherwise, unless they are able to say that it has no such tendency.

Let us first disabuse our minds of the notion that a claim for indemnity under this Act is either a suit, an action, or a cause of action. It is neither. The Act, as distinctly indicated by its title, provides for a state accident insurance and total permanent disability fund for coal miners. By its terms, a method of compensation is provided for injury or death of a coal miner, regardless of the manner in which the injury was inflicted or the death caused. It ignores, and was intended to ignore, any question of fault on the part of either employer or employee. It provides an insurance for persons who have no cause of action at law, and extends its benefits also to those who have a cause of action, if they so elect. But we may, for the moment, disregard the latter consideration, and treat the Act as simply providing indemnity for those who could not successfully prosecute an action in the courts. So regarded, it is essentially extra-judicial in character.

The police power of the state is not to be rigidly defined, or confined to set cases. Mr. Alfred Russell, in his work, Police [2] Powers of the State (pages 25 and 26), says: "What the police power is, and what its extent and limitations are, can only be ascertained by the gradual processes of judicial inclusion and exclusion as the cases presented for decision require." Professor Ernst Freund says: "From the mass of decisions, in which the nature of the power has been discussed, and its application either conceded or denied, it is possible to evolve at least two main attributes or characteristics which differentiate the police power: It aims directly to secure and promote the pub-

lic welfare, and it does so by restraint and compulsion."
(Freund on Police Power, sec. 3, p. 3.)   Mr. Justice Holmes,
speaking for the supreme court of the United States, in *Noble
State Bank* v. *Haskell*, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed.
112, 32 L. R. A., n. s., 1062, said: "If we have a case within
the reasonable exercise of the police power, no more need be
said.   In a general way, the police power extends to all the great
public needs.   It may be put forth in aid of what is sanctioned
by usage, or held by the prevailing morality or strong and pre-
dominant opinion to be greatly and immediately necessary to
the public welfare."

For the purposes of this case, let us turn from its humani-
tarian features, and suppose for the moment that the sole object
of the Act is to prevent persons injured in coal mines, and their
dependents, from becoming public charges.   Viewed in this
light, the private benefits to be derived from the law may be dis-
regarded, and its primary object held to be one of public con-
cern solely.   Moreover, it cannot be doubted, we think, that
the general welfare of the state and its standing among its sis-
ter states, as well as among persons generally, necessarily includ-
ing those who have money to invest, and those who seek new
homes and new locations, depends in a great measure upon its
industries and the class and welfare of its wageworkers.   Any
measure which tends to minimize indigency, of necessity raises
the general standard of the people; any statute which has a
tendency to reduce the present enormous expense of operating
our courts would seem to be, presumptively, a proper exercise
of the police power.   The supreme court of Washington, in
*State ex rel. Davis-Smith Co.* v. *Clausen, State Auditor,* 117 Pac.
1101, while construing and sustaining a compulsory workman's
compensation law (Laws of 1911, Chap. 74), said: "The inquiry
should be: Is there no reasonable ground to believe that the
public safety, health, and general welfare is promoted thereby?
It is unnecessary to discuss the origin, nature, or extent of the
police power.   It is sufficient to say that, by means of it, the
legislature exercises a supervision over matters affecting the
common weal, and enforces the observance by each individual

member of society of duties which he owes to others and the community at large. The possession and enjoyment of all rights are subject to this power. Under it the state 'may prescribe regulations promoting the health, peace, morals, education, and good order of the people, and legislate so as to increase the industries of the state, develop its resources, and add to its welfare and prosperity.' In fine, when reduced to its ultimate and final analysis, the police power is the power to govern.'' The court then cited many cases in which statutes creating liability without fault have been upheld. If we are correct in our conclusions, however, these cases have no great pertinency to this branch of the inquiry. They all relate to the protection of private rights. The statute of Washington in terms abolishes all civil actions and civil causes of action for personal injuries incurred in certain extrahazardous employments, and the jurisdiction of the courts therein, except as in the Act provided. And, in so far as the case just cited holds that the Act was a proper exercise of the police power, it is a direct authority in this case, and, we think, reaches a correct conclusion.

Mr. Robert J. Cary, of Chicago, in his brief on the Power of Congress in Respect of Industrial Insurance, at page 51 says: ''The body of law involved in the law of torts and employer's liability statutes pertains entirely to the redress of private wrongs. In such instance, liability results in the payment of damages to the employee intended to be commensurate with, and to reimburse him for, the injury suffered. Such law has for its sole object and end the regulating of private rights. * * * The obligations, on the other hand, of industrial insurance and workmen's compensation accrue from contingencies not dependent upon or within the control of the parties, and thus have no relation whatever to the conduct of the parties; hence, these obligations are not based upon wrongs. It follows, then, that they must pertain to the subject of government regulations, and are in the nature of economic provisions, taking the form of indirect taxation levied to regulate occupations, for on what other basis would the government be justified in writing into the labor contract, against the will of the parties, an insurance

policy? Were this not so, industrial insurance or workmen's compensation would be, from the standpoint of both the employee and the employer, without basis of justice or equity; for the theory of such laws is that compensation is not to be commensurate with injury, but is to be based upon wages, thus substituting for the former obligations based upon tort, which offered damages commensurate with injury, a purely arbitrary sum. Such a scheme can have no relation to the adjustment of private wrongs. If it be justifiable, it must be on the sociological theory of the right of the state to levy a tax for the purpose of protecting, from an economic standpoint, the community as a whole.''

The supreme court of the United States, in the case of *Lawton* v. *Steele,* 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385, used this language: ''The extent and limits of what is known as the police power have been a fruitful source of discussion in the appellate courts of nearly every state in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power, it has been held that the state may order the destruction of a house falling to decay, or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane, or those affected with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill-fame; and the prohibition of gambling-houses and places where intoxicating liquors are sold. Beyond this, however, the state may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the

44 Mont.—14

legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests." And, again, in *Holden* v. *Hardy,* 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780, the court said: "This court has not failed to recognize the fact that the law is, to a certain extent, a progressive science; that in some of the states methods of procedure, which at the time the Constitution was adopted were deemed essential to the protection and safety of the people, or to the liberty of the citizen, have been found to be no longer necessary; that restrictions which had formerly been laid upon the conduct of individuals, or of classes of individuals, had proved detrimental to their interests; while, upon the other hand, certain classes of persons, particularly those engaged in dangerous or unhealthful employments, have been found to be in need of additional protection.  *  *  *  While the cardinal principles of justice are immutable, the methods by which justice is administered are subject to constant fluctuations, and the Constitution of the United States, which is necessarily and to a large extent inflexible and exceedingly difficult of amendment, should not be so construed as to deprive the states of the power to so amend their laws as to make them conform to the wishes of the citizens as they may deem best for the public welfare, without bringing them into conflict with the supreme law of the land."

In our judgment, the general scheme of this Act is well within the police power of the state. If the people, represented by their legislature, are of opinion that the public interests demand that industrial insurance ought to be substituted, in whole or in part, for actions for wrongs, this court certainly cannot say that they are in error.

2. But it is contended that the Act is an example of class legislation, and several reasons are urged in support of this contention. [3] The first is that it singles out one particularly hazardous employment, and subjects it to burdens not placed upon other extrahazardous employments within the state.

The legislature has declared, in effect, that coal mining is a dangerous and extrahazardous business, and we think it is generally known to be so. The court of appeals of New York, in

*Ives* v. *South Buffalo Ry. Co.,* 201 N. Y. 271, 94 N. E. 431, disposed of this question, correctly we think, as follows: "The appellant contends that the classification in this statute of a limited number of employments as dangerous is fanciful or arbitrary, and is therefore repugnant to that part of the Fourteenth Amendment to the federal Constitution which guarantees to all our citizens the equal protection of the laws.  Classification, for purposes of taxation, or of regulation under the police power, is a legislative function, with which the courts have no right to interfere, unless it is so clearly arbitrary or unreasonable as to invade some constitutional right.  A state may classify persons [4] and objects for the purpose of legislation, provided the classification is based on proper and justifiable distinctions, and for a purpose within the legislative power.  There can be no doubt, we think, that all of the occupations enumerated in the statute are more or less inherently dangerous to a degree which justifies such legislative regulation as is properly within the scope of the police power.  *  *  *  The mandate of the federal Constitution is complied with if all who are in a particular class are treated alike; and that, we think, is the effect of this classification." (See, also, *Orient Insurance Co.* v. *Daggs,* 172 U. S. 557, 19 Sup. Ct. 281, 43 L. Ed. 552; *Magoun* v. *Illinois T. & S. Bank,* 170 U. S. 283, 18 Sup. Ct. 594, 42 L. Ed. 1037.)

In the case of *Quong Wing* v. *Kirkendall,* 39 Mont. 64, 101 Pac. 250, this court said: "The legislature is presumed to have exercised a reasonable discretion in making the classification, and the courts ought not to interfere with the action of this co-ordinate branch of the government, until the (party) upon whom rests the burden of proof clearly shows that he is denied the equal protection of the laws.  Every intendment is in favor of the validity of the legislative action.  In other words, the classification is presumed to be reasonable."

The fact that coal mining is alone selected from numerous other dangerous employments is not at all significant.  Legislation of this character is in its infancy, and if it be found adequate to correct the evils growing out of the present system, it may gradually be extended to apply to all extrahazardous em-

ployments.   So long as all persons operating coal mines are treated alike, no one of them has cause of complaint.   The same may be said of coal miners.   (See *Soon Hing* v. *Crowley*, 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145, and *Missouri Pac. Ry. Co.* v. *Mackey*, 127 U. S. 205, 8 Sup. Ct. 1161, 32 L. Ed. 107.)

3.   Before proceeding to discuss the other questions involved, it may be well to fix the status of the parties to whom the Act applies, to-wit, operators of and employees in coal mines, as indicated by the Act itself.   We hold to the following propositions:

(1) That the right to exercise police authority as such over the operator arises, in part at least, from the fact that he is engaged in an extrahazardous business, which may, by reason of the liability of his employees to injury therein, resulting in death or partial or permanent disability, cause them to become public charges, thus lowering the standard of citizenship and increasing the general burden of taxation; and from the further fact that our present system of common-law and statutory actions greatly increases the expense of maintaining our courts, causes a vast economic waste, and tends to create breaches and dissensions between employer and employee which would otherwise not exist.   (*St. Louis Con. Coal Co.* v. *Illinois*, 185 U. S. 203, 22 Sup. Ct. 616, 46 L. Ed. 872.)   The latter consideration is one pertaining to the peace, order, and morals of the community, which are universally recognized as subject to control and regulation by the state.   (*State* v. *Penny*, 42 Mont. 118, 111 Pac. 727.)

(2) The exercise of the police power is properly and necessarily supplemented by the taxing power of the commonwealth, in order to carry the general plan into practical effect.   Or, perhaps, it is more accurate to say that the power to tax for the purposes of the Act is necessarily included in the police power.   It will readily be seen that, unless the power to impose taxes upon the extrahazardous industry can be invoked to create an insurance fund, the Act is nugatory.

Beyond doubt there can be no lawful tax which is not laid for a public purpose.   What is a public purpose?   Hav-

ing determined that the general design of the Act may be upheld as a proper exercise of the police power—that is, as being a scheme which may result to the public welfare—we are justified, perhaps, in accepting as a corollary the conclusion that the tax imposed is for a public purpose. Again, if the Act abolished actions and causes of action for personal injuries and death, the tax might be justified on the theory that the state had given a *quid pro quo* to the employer. But such is not the situation with which we have to deal. As a matter of fact, the tax is imposed for the purpose of creating a fund to indemnify certain individuals and classes of individuals, and actions at law are not abolished. It is imposed on an extrahazardous employment for the presumed reason that such employment is pregnant with possibility of injury to the employee. The business of coal mining is not unlawful or immoral; on the contrary, it is lawful and necessary. But it is extremely dangerous and therefore subject to regulation. The tax cannot be likened to a special assessment for local improvements, for the reason that such an assessment is primarily a lien upon the property benefited, and also because the supposed justification for such assessment rests in the idea that the owner receives a direct, substantial return for such tax in the enhanced value of his property. In our judgment, the better reasoning leads to the conclusion that this impost is an employment tax upon the occupations of operating and working coal mines. It is not at all necessary to justify the imposition of such a tax that the business itself should particularly require police supervision, although, as we have seen, extrahazardous enterprises may demand restraint and regulation. Such a tax may be imposed, either for regulation or revenue, or for both. Property and occupation are alike legitimate objects of taxation. (See section 1, Art. XII, of the state Constitution.)

The supreme court of Wisconsin, in *Brodhead* v. *City of Milwaukee,* 19 Wis. 658, 88 Am. Dec. 711, held that a tax imposed for the payment of bounties to volunteers who might enlist in the service of the United States during the Civil War was for a public purpose. Mr. Chief Justice Dixon said: "The objects

for which money is raised by taxation must be public, and such as conserve the common interest and well-being of the community required to contribute. To justify the court in arresting the proceedings and declaring the tax void, the absence of all possible public interest in the purposes for which the funds are raised must be clear and palpable—so clear and palpable as to be perceptible to every mind at the first blush. In addition to these, I understand that it is not denied tnat claims founded in equity and justice in the largest sense of those terms, or in gratitude or charity, will support a tax. Such is the language of the authorities. I think the consideration of gratitude alone to the soldier for his services   *   *   *   will sustain a tax for bounty money to be paid him or his family.   *   *   * It is a matter which ultimately concerns the public welfare, and that nation will live longest in fact, as well as in history, and be most prosperous, whose people are most sure and prompt in the reasonable and proper acknowledgment of such obligations.''

The supreme court of Connecticut, speaking to the same subject, in *Booth* v. *Town of Woodbury,* 32 Conn. 118, said: ''In the first place, if it be conceded that it is not competent for the legislative power to make a gift of the common property, or of a sum of money to be raised by taxation, where no possible public benefit, direct or indirect, can be derived therefrom, such exercise of the legislative power must be of an extraordinary character to justify the interference of the judiciary; and this is not the case. Second, if there be the least possibility that making the gift will be promotive in any degree of the public welfare, it becomes a question of policy, and not of natural justice, and the determination of the legislature is conclusive. Such gifts to unfortunate classes of society, as the indigent blind, the deaf and dumb, or insane, or grants to particular colleges or schools, or grants of pensions, swords or other mementos for past services, involving the general good indirectly and in slight degree, are frequently made and never questioned.''

Judge Cooley, in his Constitutional Limitations (7th ed., p. 698), says this: ''Not only are certain expenditures absolutely essential to the continued existence of the government and the

performance of its ordinary functions, but, as a matter of policy, it may sometimes be proper and wise to assume other burdens which rest entirely on considerations of honor, gratitude, or charity. There will therefore be necessary expenditures, and expenditures which rest upon considerations of policy only, and, in regard to the one as much as to the other, the decision of that department to which alone questions of state policy are addressed must be accepted as conclusive.''

No one has ever thought to question the power of the legislature to erect memorials to certain distinguished citizens of Montana who have passed away. The erection of these memorials was actuated entirely by sentiment, but who shall deny that their contemplation has a tendency to raise, or at least to maintain, our general standard of citizenship?

The fact that the Act operates to the direct benefit of the injured employee or his dependents does not of itself characterize the measure as one for private purposes only. We think the considerations to which we have heretofore adverted demonstrate that the provisions of the Act disclose the fact that its enactment may have been so far a matter of public concern, involving the general good and welfare, that the legislature, in carrying forward the policy of the state, directed by a clearly defined, dominant public opinion, was warranted in declaring, by implication, that the purpose for which the tax is imposed is a public one. This being so, the courts have no power to declare otherwise.

4. Is the right to trial by jury denied? Article VII of the amendments to the Constitution of the United States does not [8] guarantee a trial by jury in a civil action in a state court. (*Walker* v. *Sauvinet,* 92 U. S. 90, 23 L. Ed. 678.) Section 23 of Article III of the state Constitution provides that the right of trial by jury shall be secured to all, and remain inviolate. This provision has been construed by this court as applying only to those cases wherein a right of trial by jury existed at the date of the adoption of the Constitution. (*Montana Ore Pur. Co.* v. *Boston & Mont. Con. C. & S. Min. Co.,* 27 Mont. 288, 70 Pac. [9] 1114.) Section 23 of Article III of the Constitution,

*supra,* refers in terms to "civil cases" and "criminal cases." We shall not concern ourselves with the origin and growth of actions for fault. Suffice it to say that they were known to the common law, and are popularly referred to as common-law actions. It was a rule of the common law, speaking generally, that for the death of one person caused by the wrongful act of another, there was not any remedy by civil action. Because of the harshness of this rule, the English Parliament, in 1846, enacted a statute known as "Lord Campbell's Act," and this Act is the model after which a like statute has been enacted in nearly every American state, including Montana. (See *Dillon* v. *Great Northern Ry. Co.,* 38 Mont. 485, 100 Pac. 960.) The legislature of 1903 passed an Act rendering railroad companies liable for injuries to employees caused by the negligence of certain other employees (see Laws of 1903, p. 156), and the legislature of 1905 further enlarged the common-law liability of persons or corporations operating railroads (see section 5251, Rev. Codes). Many other instances might be cited from our own statutes. There can be no doubt of the power of the legislature to abolish these provisions by repealing the statutes. Indeed, all of our actions for wrongs may be regarded as in some degree statutory. The court of appeals of New York, in the *Ives Case, supra,* held that the legislature had power to abolish the fellow-servant rule and the law of contributory negligence, as applied to injuries to servants, and also to a limited extent to regulate the application of the doctrine of assumed risk. The legislature may alter or repeal the common law. (*Bertholf* v. *O'Reilly,* 74 N. Y. 509, 30 Am. Rep. 323.) Many rules of the common law are abolished by our Code; and section 8060, Revised Codes, expressly declares that in this state there is no common law in any case where the law is declared by the Code or the statute. We find nothing in the Constitution to indicate that it is incumbent upon the legislature to preserve the present system of actions for negligence so as to cover future happenings. (And see *Martin* v. *P. & L. E. R. Co.,* 203 U. S. 284, 27 Sup. Ct. 100, 51 L. Ed. 184; *Atchison T. & S. F. Ry. Co.* v. *Sowers,* 213 U. S.

55, 29 Sup. Ct. 397, 53 L. Ed. 695; *Sawyer* v. *El Paso & N. E. Ry. Co.,* 49 Tex. Civ. App. 106, 108 S. W. 718.)

The right of trial by jury, which is secured and protected by the Constitution, refers to the trial of cases, actions, or suits at [10] law (see *Koppikus* v. *State Capitol Commissioners,* 16 Cal. 249), and has no reference to claims against an indemnity fund, such as are provided for by this Act, or demands by the state auditor for occupation taxes. There is not anything in the Constitution guaranteeing a right of trial by jury in case of demand for a license or occupation tax. The adjustment of claims under the Act is an administrative function and not a judicial proceeding, and it is only in certain cases falling under the latter designation that trial by jury is guaranteed by the Constitution. "Due process of law" does not necessarily require a jury trial. (*Montana Co.* v. *St. Louis Min. Co.,* 152 U. S. 160, 14 Sup. Ct. 506, 38 L. Ed. 398.)

5. This brings us to the question, Does the system and machinery provided in the Act constitute due process of law?

The phrase "due process of law" does not necessarily mean by [11] a judicial proceeding. In the case of *Den* v. *Hoboken Land & Improvement Co.,* 18 How. 272, 15 L. Ed. 372, the supreme .court of the United States decided that a sale of land by a marshal of the United States on a distress warrant was due process of law. That case contains a very interesting and instructive discussion of the subject. But we need go no further than to inquire whether the collection of an occupation tax in the summary manner provided by the Act affords due process of law. [12] This question is set at rest, as to taxes generally, by the case of *Kelly* v. *City of Pittsburgh,* 104 U. S. 78, 26 L. Ed. 658, wherein the court said: "Taxes have not, as a general rule, in this country since its independence, nor in England before that time, been collected by regular judicial proceedings. The necessities of government, the nature of the duty to be performed, and the customary usages of the people have established a different procedure, which, in regard to that matter, is, and always has been, due process of law." (See, also, *Palmer* v. *McMahon,* 133 U. S. 660, 10 Sup. Ct. 324, 33 L. Ed. 772.)

The case of *McMillan* v. *Anderson,* 95 U. S. 37, 24 L. Ed. 335, was an action to enjoin the collection of a license tax. The court, in affirming a judgment of the supreme court of Louisiana, dissolving a preliminary injunction, said: "The mode of assessing taxes in the states by the federal government, and by all governments, is necessarily summary, that it may be speedy and effectual. By summary is not meant arbitrary, or unequal, or illegal. It must, under our Constitution, be lawfully done. * * * It seems to be supposed that it is essential to the validity of this tax that the party charged should have been present, or had an opportunity to be present, in some tribunal when he was assessed. But this is not, and never has been, considered necessary to the validity of a tax." The opinion then proceeds to show that under the laws of the state of Louisiana the person assessed has a remedy by application to the courts, if he be wrongfully taxed. Our statute (section 2741, Revised Codes), by necessary implication, provides a remedy by injunction in cases where the tax demanded is illegal or not authorized by law; and section 2742, Revised Codes, providing for payment of "taxes, licenses and other demands for public revenue" under protest, the amount to be later recovered in an action at law, is, we think, applicable to unauthorized demands by the state auditor. In the case of *Chauvin* v. *Valiton,* 8 Mont. 451, 20 Pac. 658, 3 L. R. A. 194, this court, speaking through Chief Justice McConnell, delivered a very exhaustive opinion concerning "due process of law." The views therein expressed accord with those of other courts on the subject, and seem determinative of the question we are considering. (See, also, *McMillan* v. *City of Butte,* 30 Mont. 220, 76 Pac. 203.)

6. The contention that the provision for payment to an injured employee of his compensation in a lump sum defeats the purpose [13] of the Act, viewed as a police regulation, is untenable. It may be that in some instances the employee will dissipate and waste the money so paid, and will thereby render himself indigent; but there is not any presumption that he will do so, and in many instances, we think, such will not be the case. Many employees will undoubtedly conserve the amount received,

and use the same for future maintenance and support. We are aware that there is considerable· criticism of proposed legislation containing provisions similar to the one we have in mind, but the matter is not for judicial decision. The expediency of the measure in this regard was for legislative determination exclusively.

7. Again, it is argued the Act does not differentiate between a careful and a careless employer. We think this argument is [14] fully answered by the decision of the supreme court of the United States, in *Noble State Bank* v. *Haskell, supra.* Moreover, that case is authority for several of the conclusions reached in this case.

8. But, it is said, the Act lodges judicial power in the state auditor. What has heretofore been said applies in large measure [15] to this contention. Indeed, many of the questions involved in the case are so interwoven that it is difficult to determine where one ends and another begins. Let it be noted, however, that the Act is almost, if not completely, automatic in practical working. The amounts to be paid by the operator, based as they are upon the tonnage of coal mined and shipped, or sold locally, or mined and ready for shipment or sale, are easy of computation, as is also the amount to be deducted from the wages of the workmen, to-wit, one per cent thereof. The sum to be paid in case of death is fixed and certain, as are also the person or persons to whom it shall be paid. In case of injury, the amount of compensation is also fixed, dependent upon the character and extent of the injury. The auditor has power to formulate rules and regulations, not inconsistent with the provisions of the Act. In case of death of a workman, he may require satisfactory evidence of such death, and all applications for monthly payments under the Act must be accompanied by a certificate from the county physician, and be attested before a notary public. We think these provisions insure, *prima facie,* protection to the fund in the hands of the auditor. It is also provided that if any person, company, or corporation who is a contributor to the fund shall believe that an improper or fraudulent claim has been made thereon, the secretary of the state

board of health must investigate the matter, and his determina-
tion shall be conclusive.

It may be, considering the novel character of this legislation,
that the auditor will encounter some slight obstacles in perform-
ing his duties. The difficulties which he may thus meet, how-
ever, will relate more to the details of administration than to
any fundamental defect in the Act itself, and, we have no doubt,
may be to a great extent minimized by the promulgation of
reasonable rules and regulations for the conduct of his office,
as well as for the guidance of contributors to and claimants
against the fund. After all, such considerations are pre-emi-
nently for the legislative branch of the government to deal with.
Possibly time and experience will demonstrate that amendments
to or changes in the Act will be advisable; but, as was well said
by the supreme court of Washington, in the *Clausen Case, supra:*
"The courts cannot do otherwise than put it to the test of prac-
tice." If we are correct in our former conclusions that the Act
affords due process of law, and the right of trial by jury has
not been violated, then it seems clear that any controversy which
may arise concerning the mere administrative duty of collecting
and distributing the fund may be decided in such summary
manner as the state shall prescribe. To again quote from Mr.
Cary's able brief (page 134): "The government may prescribe
summary methods of adjudication through its administrative
officers whose decisions shall be conclusive; or it may provide,
as was suggested in *Den* v. *Hoboken Land & Improvement Co.*,
that the controversy shall take a judicial form, and be deter-
mined by such remedial procedure as the government shall create
for this purpose." Regarded as an Act to provide a fund for
the benefit of certain employees and their dependents, who would
otherwise be remediless, we have no doubt that it is within the
power of the legislative assembly to intrust the administration
of the fund to such official as it may see fit.

The fact that one who has a cause of action at common law
may elect to take under the Act, and the suggestion that as to
him the auditor may be called upon to exercise judicial power,
has no persuasive force when we consider that such election is

altogether voluntary, and he may resort to the courts if he so desires.   If the tax provided for in the Act can legally be exacted from the employer, and, as is the case, the acceptance of its benefits by the claimant *ipso facto* operates to release the employer from liability, it is difficult to see how the latter has any further concern in the matter of distribution of the fund than to be assured, as the Act provides he may be, that it is not paid out on improper or fraudulent claims.   If the summary method of administration provided may not be resorted to, then one of the paramount reasons for this class of legislation must be entirely eliminated from consideration.   It seems to us that the opinion of the supreme court of the United States, in *Den v. Hoboken Land & Improvement Co., supra,* effectually disposes of this question, as well as of some others which we have considered.   As this opinion is already too long, however, we shall content ourselves with a single quotation therefrom: "Though, generally, both public and private wrongs are redressed through judicial action, there are more summary extrajudicial remedies for both."

9. Contention No. 5, *supra,* has been reserved for final consideration, for the reason that, while the question raised thereby [16] is by no means so fundamental in character as many of those already disposed of, it is nevertheless decisive of the case. It is therein contended that in reserving to the employee his right to an action at law the Act denies to the mine operator the equal protection of the laws.   We have decided that the fact that actions at law are not abolished by the Act is not, of itself, a sufficient reason for declaring the statute unconstitutional.   We do not believe "that for the purpose of determining the validity of the tax it is necessary to find an immediate specific benefit to the individual taxed," as is maintained by some writers on the subject.   We think we have already shown that if the Act can be justified at all it must be upon a much broader principle than that above indicated.   The duty to make payments as provided in section 2 is absolute and unconditional. It can be enforced by appropriate action.   But, after full com-

pliance with the terms of the Act, the employer is not exonerated from liability. He may still be sued and compelled to pay damages in a proper case. No provision is made for reimbursement in whole or in part. The injured employees of one operator may all resort to the indemnity fund, while those of another may elect to appeal to the courts. The result is that the employer against whom an action is successfully prosecuted is compelled to pay twice. He has fully paid his assessments under the Act, and is also obliged to pay damages. This fact is so palpable as to be needless of discussion. The Act in this regard is not only inequitable and unjust, but clearly illegal and void, as not affording to such employer the equal protection of the laws. The legislature of the state of Washington guarded against this contingency by abolishing all actions for negligence. (Chapter 74, Sessions Laws, Washington, 1911.) The general assembly by Maryland, in an Act somewhat similar to ours (see Pub. Loc. Laws of Maryland 1910, Chap. 153, sec. 10), provided: "If any suit or action be brought against any operator for or in respect of any injury or disability received by an employee while in the discharge of his duty or for death resulting therefrom   *   *   *   and said operator shall appear and defend such suit or action and a judgment shall be rendered against him, he shall, after satisfying said judgment   *   *   *   be entitled thereafter to deduct from the payments required to be made by him   *   *   *   a sum equal to the amcunt of said judgment and costs."

The manner in which the equal protection of the laws shall be afforded to the operator is, of course, for the legislative body to determine; but some method must assuredly be provided to protect him from double payments. The Act in its present form is, in this regard, so repugnant to all ideas of equity and equality that it must, we think, appeal to every right-thinking person, on the most cursory examination, as unjust. It was to guard against such legislation as this, as we apprehend, that the framers of all American constitutions guaranteed to the citizen the equal protection of the laws.

The judgment is reversed, and the cause is remanded, with directions to enter a judgment for the defendant.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY concurs.

MR. JUSTICE HOLLOWAY: I concur in the result but prefer not to express an opinion at this time upon some of the questions discussed, as I do not deem a determination of them necessary to a decision of the case presented.